## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CYNTHIA and PERFECTO PROVENCIO,

   Plaintiffs,

v.             CIV. NO. 05-1280 WPL/RLP

STEVEN L. WENRICH, D.O.,

   Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION FOR SUMMARY JUDGMENT

  Cynthia and Perfecto Provencio filed suit under 42 U.S.C. § 1983 against Steven Wenrich, D.O., for refusing or failing to complete a sterilization procedure on Cynthia Provencio. The Provencios claim that Wenrich violated their constitutional rights of due process, privacy, and personal and familial integrity, and they bring several state law claims. This matter is before me on Wenrich's Motion for Summary Judgment [Doc. 12] and Memorandum in support of motion for summary judgment [Doc. 13], the Provencios' Response [Doc. 16], and Wenrich's Reply [Doc. 20]. Having considered the briefs, pleadings, and applicable law, I will grant Defendant's motion.

### FACTUAL BACKGROUND

  Cynthia Provencio was expecting her fourth child in Fall 2002. [Doc. 16 Ex. 1] She and her husband, Perfecto Provencio, decided that they did not want any more children and that Cynthia Provencio would undergo permanent sterilization through a left tubal ligation (salpingectomy). [Doc. 1 at 1]

  Cynthia Provencio was receiving prenatal and obstetrical care from Steven Wenrich, D.O.

[Doc. 16 Ex. 1]   Wenrich was a board certified obstetrician/gynecologist in private practice in Alamogordo, New Mexico.  [Doc. 13 Ex. A]  In 2002 he was the owner and director of Women's Health Center, P.C., a private, for-profit corporation.  *Id.*  He has never been an employee of the State of New Mexico or any public entity.  *Id.*  Approximately thirty to forty percent of the income generated by his practice is for medical services rendered to patients covered by Medicaid.  *Id.*

The Provencios could not afford a tubal ligation, but were told by Wenrich that Medicaid would pay for the procedure if performed in conjunction with the delivery of Cynthia Provencio's fourth child. [Doc. 16 Ex. 1]  They were also told that the State of New Mexico would have to give prior approval for the procedure.  *Id.*  The Provencios worked with Wenrich's staff to complete the forms required for the procedure.  *Id.*  The Provencios consented to the procedure and Wenrich agreed to perform it.  *Id.*

Wenrich delivered Cynthia Provencio's child on December 12, 2002, and proceeded to perform what he believed to be a tubal ligation of her left fallopian tube.  *Id.* at 2.  A pathology report concluded that Wenrich ligated Provencio's ligament, not her fallopian tube.  *Id.*  On December 18, 2002, Wenrich met with Cynthia Provencio for her first post-operative visit.  [Doc. 13 Ex. A]  He informed her that the tubal ligation may not have been successful and that she should obtain additional testing.  [Doc. 13 Ex. A, Doc. 16 Ex. 1]   Wenrich billed Medicaid for the services he provided to Cynthia Provencio.  [Doc. 13 Ex. A]

Cynthia Provencio eventually became pregnant with her fifth child.  [Doc. 16 Ex. 1]  She submitted forms so that Medicaid could approve and pay for a sterilization procedure during the delivery of her fifth child.  *Id.*  Cynthia Provencio received this procedure when she delivered her fifth child and Medicaid paid for it.  *Id.*

## LEGAL STANDARDS

Federal district courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, __ U.S. __, __, 125 S. Ct. 2611, 2616 (2005). They are to presume that they lack jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and the party invoking jurisdiction bears the burden of proof. *Penteco Corp. Ltd. P'ship--1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991). Federal Rule of Civil Procedure 12(b)(1) provides for challenges to the subject-matter jurisdiction of a federal court. FED. R. CIV. P. 12(b)(1); *see Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1294 (10th Cir. 2003). "Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). Wenrich states that he is making a factual attack on the Court's jurisdiction over the Provencios' § 1983 claims. [Doc. 13 at 3-4]

"[W]here the complaint . . . is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions later noted, must entertain the suit." *Bell v. Hood*, 327 U.S. 678, 681-82 (1946). The Tenth Circuit has stated that in such a case the merits and the question of the court's jurisdiction are intertwined. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995); *Bloomer v. Norman Reg'l Hosp.*, No. 99-6074, 2000 WL 963336, at *2 (10th Cir. July 12, 2000) (unpublished). If the resolution of the jurisdictional question is intertwined with the merits of the case, a court must convert a Rule 12(b)(1) motion into a Rule 12(b)(6) motion or, after proper conversion, a Rule 56 summary judgment motion. *See United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1159 (10th Cir. 1999);

3

*United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 (10th Cir. 1996). The state action requirement is ordinarily treated as an element of the claim. *Elliott v. Chrysler Fin.*, No. 05-2073, 149 F. App'x 766, 768-69 (10th Cir. Sept. 2, 2005) (unpublished) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The Supreme Court identified two exceptions to the rule that a federal court possesses jurisdiction when a complaint is drawn to rely directly upon a federal statute. *Bell*, 327 U.S. at 682-83. The action may be dismissed for lack of jurisdiction only if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.*

The Provencios bring their claims pursuant to § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. § 1331. *See Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994); *Amisub (PSL), Inc. v. State of Colo. Dept. of Social Servs.*, 879 F.2d 789, 790 (10th Cir. 1989). The Provencios' complaint is drawn to rely directly upon a federal statute. [Doc. 1]  A § 1983 claim is subject to *Bell* since it relies directly upon a federal statute and the court's jurisdiction and the merits are intertwined. *See White v. SPE Corperate [Sic] SVC, Inc.*, 393 F. Supp. 2d 1110, 1114 (D.N.M. 2005).

The claim here does not appear to be made solely to establish jurisdiction, nor is it wholly insubstantial and frivolous.  It is appropriate in this case to take jurisdiction and decide the merits. *See Bell*, 327 U.S. at 681-82.  Therefore, instead of treating Wenrich's motion as jurisdictional, I will treat it as a 12(b)(6) motion to dismiss converted to a motion for summary judgment since I will rely on affidavits. *See Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 713 (10th Cir. 2005); *Century Healthcare*, 90 F.3d at 1518.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court examines the factual record and makes all inferences in a light most favorable to the non-moving party. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

The party moving for summary judgment has the burden to demonstrate an absence of evidence supporting the non-moving party's case. *Id.* The moving party must identify the portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must identify specific facts showing the existence of a genuine issue of material fact. *Munoz*, 221 F.3d at 1164. A "material" fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). There is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). It is not sufficient that the evidence brought forward by the non-moving party is "merely colorable" or anything less than "significantly probative." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (quoting *Liberty Lobby*, 477 U.S. at 249-50).

### THE PROVENCIOS' SECTION 1983 CLAIMS

To state a claim under § 1983, the Provencios must demonstrate that they "were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was

5

committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.* at 50 (internal quotations omitted). If conduct constitutes state action under the Fourteenth Amendment, then that conduct is also action under color of state law which would support a § 1983 claim. *West v. Atkins*, 487 U.S. 42, 49 (1988); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982). Courts therefore look to decisions interpreting the state action requirement when applying the under-color-of-state-law requirement. *Jojola v. Chavez*, 55 F.3d 488, 492 n.5 (10th Cir. 1995).

"Application of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (internal quotations omitted). The Supreme Court has noted that the state action inquiry "frequently admits of no easy answer," *id.* at 1447 (quoting *Jackson v. Metro Edison Co.*, 419 U.S. 345, 350 (1974)), and that its state action cases "have not been a model of consistency," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995). It would be an "impossible task" to "fashion and apply a precise formula" for determining state action, and the Court has never attempted to do so. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.*

The ultimate question in the state action determination is whether the alleged violation of federal law is "fairly attributable to the State." *Beedle v. Wilson*, 422 F.3d 1059, 1065 (10th Cir. 2005). The Supreme Court has developed a two-part test to determine this issue. *Lugar*, 457 U.S. at 937. "First, the deprivation must be caused by the exercise of some right or privilege created by

the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* These two principles are related, but they diverge when the constitutional claim is directed against a private party. *Id.* "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). I turn first to *Lugar*'s second prong. *See, e.g., Barnard v. Young*, 720 F.2d 1188, 1189 (10th Cir. 1983).

In *Tool Box v. Ogden City Corp.*,[1] the Tenth Circuit reviewed four tests that the Supreme Court has employed to determine the "inherently murky calculation" of whether the conduct of a private party constitutes state action: (1) the public function test, (2) the nexus test, (3) the joint action test, and (4) the symbiotic relationship test. *Tool Box v. Ogden City Corp.*, 316 F.3d 1167, 1175-77 (10th Cir. 2003), *vacated on reh'g en banc*, 355 F.3d 1236 (10th Cir. 2004). Under each of these tests, "the conduct allegedly causing the deprivation of a federal right" must be "fairly attributable to the State." *Johnson v. Rodrigues (Orozco)*, 293 F.3d 1196, 1203 (10th Cir. 2002). The Court has taken a flexible approach to this question, applying a variety of tests to the facts of the case. *Id.* at 1202. "Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here." *Lugar*, 457 U.S. at 939.

The *Tool Box* court noted that the Supreme Court expanded upon and clarified these four

---

[1] I include *Tool Box* because it discusses the application of *Brentwood*. Since it has been vacated, I cite it only for its informational value and persuasive effect. *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1175-76 (9th Cir. 2005); *Simes v. Huckabee*, 354 F.3d 823, 829 n.4 (8th Cir. 2004); *Gould v. Bowyer*, 11 F.3d 82, 84 (7th Cir. 1993). I note that the Tenth Circuit's substituted opinion did not affect the prior state action analysis; the substituted opinion appears to assume that the state action requirement was met. *See Jornigan v. N.M. Mut. Cas. Co.*, No. CIV 03-0813, 2004 WL 3426437, at *18 n.11 (D.N.M. April 19, 2004) (unpublished).

tests by invoking the concept of "entwinement." *Tool Box*, 316 F.3d at 1176; *see Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001).   In *Johnson*, the Tenth Circuit included the entwinement test in its discussion of the symbiotic relationship test, noting that its meaning appeared to be comparable to what the Court previously described as "symbiotic relationship." *See Johnson*, 293 F.3d at 1205.   In *Tool Box*, the court applied only the entwinement test. *See Tool Box*, 316 F.3d at 1175-77.   Because the Tenth Circuit has continued to use the four prior tests and the parties' arguments are based on these tests rather than entwinement, I will apply them in addition to the entwinement test. *See, e.g.*, *Jornigan v. N.M. Mut. Cas. Co.*, No. CIV 03-0813, 2004 WL 3426437, at *20-*21 (D.N.M. April 19, 2004) (unpublished).   I will then consider the Provencios' arguments that the facts of this case are sufficiently similar to those in two other decisions to justify a finding of state action.

### Entwinement

In *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, the Supreme Court considered the state action inquiry by reference to the concept of entwinement. *See Brentwood*, 531 U.S. at 291, 296-303.   The issue was whether a statewide association with the purpose of regulating athletic competition among public and private schools engaged in state action when it enforced a rule against a member school. *Id.* at 290.   The Court held that "the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association." *Id.* at 291.   The Court based this decision on several facts demonstrating the required degree of entwinement. *Id.* at 298-300.   These include: the fact that eighty-four percent of the member schools were public; the organization was overwhelmingly composed of public school officials; public schools provided most of the association's financial

support; state board of education members were assigned ex officio to serve as members of the association's board of control and legislative council; and the association's ministerial employees were allowed to participate in the state retirement system.  *Id.*

The Court stated that the results of a different test for state action do not affect the result when "the relevant facts show pervasive entwinement to the point of largely overlapping identity." *Id.* at 303.  The Court noted that no one fact can be a necessary condition to, nor is any circumstance absolutely sufficient for, a finding of state action.  *Tool Box*, 316 F.3d at 1176.  Rather, the four tests are tools for factual analysis of the fairness of attributing the challenged conduct to the government. *See id.*  *Brentwood* directs courts to apply the tests only so far as they focus attention on the fact-intensive nature of the inquiry.  *See id.*

The Tenth Circuit in *Tool Box* found state action where a business's application to lease property in a commercial and industrial park was denied by a review board.  *Id.* at 1171-72, 1177. The mayor chose the three members of the review board, two of whom would be city employees and one of whom would be a land owner or her representative.  *Id.* at 1172.  The mayor had final authority over all appeals from the review board.  *Id.*  The court, applying *Brentwood*, held that the review board was a state actor.  *Id.* at 1177.  It noted that the facts closely resembled those of *Brentwood* and rejected the argument that the presence of a single non-municipal board member transformed the review board into a private actor.  *Id.*  The only way to find that the board's decision was that of a private actor, the court reasoned, "would be to turn a blind eye to structural realities--all of which point to the inescapable conclusion that the review board engaged in 'conduct . . . fairly attributable to the State.'"  *Id.* (quoting *Lugar*, 457 U.S. at 937).

The concept of entwinement cannot support a finding that Wenrich engaged in state action.

Medicaid is not pervasively entwined in the operation of Wenrich's medical practice. Wenrich has never been an employee of any public entity. [Doc. 13 Ex. A]  There is no evidence that Medicaid has any control over Wenrich's practice except with regard to the procedures it pays him to perform. Even regarding those procedures, Medicaid does not heavily regulate Wenrich's provision of medical care. [*See* Doc. 16 at 3]   The regulations identified by the Provencios are general, non-medical restrictions on what procedures may be performed.  *See id.*  They mainly relate to the age of the patient and informed consent.  *See id.*  Several of these regulations are no more than requirements already imposed on Wenrich.  *See, e.g., Woods v. Brumlop*, 377 P.2d 520, 524-25 (N.M. 1962) (a physician has a duty to make a full disclosure to the patient of all facts pertinent to his illness and treatment).

To be sure, approximately thirty to forty percent of the income generated by Wenrich's practice is for services rendered to patients covered by New Mexico Medicaid.  [Doc. 13 Ex. A]  However, this demonstrates a situation similar to that of many other private entities that contract with the government to perform services.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41 (1982).  In fact, the Supreme Court has found no state action where private entities derive a much larger percentage of their income from government programs.  *See id.* at 832, 840; *Blum v. Yaretsky*, 457 U.S. 991, 1010-12 (1982).  Wenrich and New Mexico Medicaid are not sufficiently entwined to support a finding that Wenrich is a state actor.

### *Public Function*

A private party is a state actor if the state delegates to the private party a function "traditionally exclusively reserved to the State."  *Gallagher*, 49 F.3d at 1456 (quoting *Jackson*, 419 U.S. at 352).  This test is difficult to satisfy, because "[w]hile many functions have been traditionally

performed by governments, very few have been exclusively reserved to the State." *Id.* (quoting *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978)) (internal quotations omitted).

In *Blum v. Yaretsky*, the Supreme Court considered whether decisions by private nursing homes to discharge or transfer residents without notice or an opportunity for hearing constituted state action. *See Blum*, 457 U.S. at 993-94. The Court rejected the residents' argument that the nursing homes performed a traditionally exclusive public function because federal law and the state constitution required the state to provide every Medicaid patient with nursing home care. *Id.* at 1011. The Court noted that these provisions only required the state to provide funding for the nursing home services; they did not require the state itself to provide the services. *Id.* "Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public." *Id.* at 1011-12.

Wenrich's conduct was not state action under the public function test. The provision of medical care, including the provision of medical care specifically to the indigent, is not a function "traditionally exclusively reserved to the State." *See Shannon v. Shannon*, 965 F.2d 542, 547 (7th Cir. 1992) ("Clearly, hospital care, while serving the public, is not the exclusive prerogative of the State."); *Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1114 (6th Cir. 1981) ("Nor has the federal government ever exclusively reserved to itself [the] function [of providing free hospital services to those unable to pay]."). There has been no allegation that New Mexico or the federal government has reserved to itself this function. As in *Blum*, the state is required to provide funding for the procedure, not to provide the procedure itself. N.M. ADMIN. CODE 8.325.3.8 to .10, .15; [*See* Doc. 16 at 2] The conduct the Provencios complain of does not constitute state action under the public

function test.

### *Nexus*

"Under the nexus test, a plaintiff must demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Gallagher*, 49 F.3d at 1448 (quoting *Jackson*, 419 U.S. at 351).  A state may generally be held responsible for private conduct "only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* (quoting *Blum*, 457 U.S. at 1004).  "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004.

The Supreme Court has set out a number of general principles to guide this fact-specific inquiry. *See Gallagher*, 49 F.3d at 1448.  The existence of government regulations, without more, will not provide the required nexus. *Id.* (citing *Blum*, 457 U.S. at 1004; *Jackson*, 419 U.S. at 350). Further, the fact that a private entity contracts with the government or receives government funds or other assistance does not automatically convert the entity's conduct into state action. *Id.* (citing *Rendell-Baker*, 457 U.S. at 840-42).  Finally, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient" for a finding of state action. *Id.* (citing *Rendell-Baker*, 457 U.S. at 1004-05).

In *Blum*, the Court found that the state was not responsible for nursing homes' decisions to discharge or transfer their residents. *Blum*, 457 U.S. at 993, 1012.  In doing so, the Court considered several regulations imposed on the nursing homes. *Id.* at 1006-11.  These regulations (1) required

that nursing home physicians complete state-provided forms concerning patients' health; (2) required

nursing homes to make all possible efforts to transfer patients to the appropriate level of care; (3)

authorized the state to assess fines and other penalties against facilities that violate regulations; (4)

required the state to approve or disapprove continued payments to nursing homes based on their

decisions to discharge or transfer particular patients; and (5) authorized the state legislature to

provide funds for the care of the indigent. *Id.*; *Gallagher*, 49 F.3d at 1448. The Court held that

these regulations did not dictate the decision to transfer or discharge in a particular case. *Blum*, 457

U.S. at 1008-10. Rather, the decision "ultimately turn[s] on medical judgments made by private

parties according to professional standards that are not established by the State." *Id.* Therefore, the

regulations did not demonstrate a sufficient nexus to render the state responsible for the nursing

homes' decisions. *Id.*

The Provencios allege that Wenrich "agree[d] to perform Plaintiff's sterilization procedure

in accordance with the rules, regulations and laws of the State of New Mexico, and therefore was

acting at all material times under color of State law." [Doc. 1 at 5] These regulations require that

providers who furnish medical treatment must comply with all participation requirements. N.M.

ADMIN. CODE 8.325.3.11. Providers must also verify that the individuals treated are eligible for

Medicaid and determine whether they have other health insurance. *Id.* They must also maintain

records sufficient to fully disclose the extent and nature of the services rendered. *Id.* To receive

sterilization procedures, recipients must: (1) be at least 21 years of age at the time consent is given;

(2) not be mentally incompetent; (3) not be institutionalized; (4) be given information regarding the

procedure, including the risks and benefits of the procedure and the fact that it is irreversible; (5) be

instructed that their consent may be withdrawn at any time before the procedure and that they will

not lose any Medicaid benefits as result of their decision to have or not to have the procedure; and (6) voluntarily give informed consent to the sterilization procedure. *Id.* 8.325.3.12.

The state action analysis must focus on "the specific conduct of which the plaintiff complains." *Sullivan*, 526 U.S. at 51 (quoting *Blum*, 457 U.S. at 1004). This specific conduct is Wenrich's alleged refusal or failure to complete the tubal ligation. [*See* Doc. 1 at 5; Doc. 16 at 1] The fact that Wenrich is subject to state regulations, standing alone, will not provide the required nexus. *Gallagher*, 49 F.3d at 448. Like the regulations in *Blum*, the regulations here did not dictate Wenrich's alleged refusal or failure to complete the tubal ligation. The Provencios have not demonstrated that the state exercised coercive power or significantly encouraged Wenrich's conduct such that it must be deemed that of the state. *See id.* (quoting *Blum*, 457 U.S. at 1004); *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173-77 (1972) (finding no state action where the state statutes and regulations the defendant was subject to did not encourage discrimination).

The Provencios argue that the Tenth Circuit's decision in *Nieto v. Kapoor* supports their contention that the nexus test was satisfied. [Doc. 16 at 10-11] ; *see Nieto v. Kapoor*, 268 F.3d 1208 (10th Cir. 2001). In *Nieto*, the medical director of the radiation oncology department of a public hospital was sued by department employees for racial and sexual harassment. *Id.* at 1212-15, 1218. The medical director was not an employee of the hospital but worked under a contractual agreement. *Id.* at 1212. The court held that the medical director was a state actor. *Id.* at 1212, 1217. "[Defendant] was able to harass Plaintiffs because of his state authority as the Medical Director of a public radiation oncology department and because he supervised their work." *Id.* at 1217.

Wenrich's refusal or failure to complete the tubal ligation was not due to any authority granted to him by the state.   Medicaid did not give Wenrich authority similar to that exercised by

the defendant in *Nieto*.  Medicaid's approval of funding for the tubal ligation does not establish a

sufficient nexus for a finding of state action.

### *Joint Action*

The joint action test is met if "a private party is a 'willful participant in joint action with the

State or its agents.'"  *See Gallagher*, 49 F.3d at 1453 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27

(1980)).  Courts generally "examine whether state officials and private parties have acted in concert

in effecting a particular deprivation of constitutional rights." *Johnson*, 293 F.3d at 1205.  In applying

this test, courts have considered whether "both public and private actors share a common,

unconstitutional goal." *See Gallagher*, 49 F.3d at 1454.  State action is also present if "there is a

substantial degree of cooperative action between state and private officials," or there is "overt and

significant state participation in carrying out the deprivation of the plaintiff's constitutional rights."

*Id.* (internal citations and quotations omitted).  It is not sufficient that a state official merely

acquiesced in the actions of a private party. *Gallagher*, 49 F.3d at 1453.

In *Gallagher*, a concert promoter leased a facility on a public university campus for a concert

and hired a private firm to provide security services.  *Id.* at 1444-45.  Claiming that they had been

subject to unconstitutional searches, concert attendees sued the promoter, the director of the concert

facility, and the security firm. *Id.* at 1446.  The plaintiffs claimed that the promoter and security firm

acted in concert with university officials. *Id.* at 1455.  To establish this concerted action, they argued

that the university and the private actors shared a common goal of "produc[ing] a musical concert

from which each would benefit financially." *Id.*  The Tenth Circuit found that even if the parties did

share this goal, it was insufficient to establish joint action. *Id.*  The court noted that the "state and

private entities must share a specific goal to violate the plaintiff's constitutional rights by engaging

15

in a particular course of action." *Id.* (citing *Cunningham v. Southlake Ctr. for Mental Health*, 924 F.2d 106, 108 (9th Cir. 1991)).  There was not sufficient evidence that the parties shared a common goal of performing pat-down searches on concert patrons. *Id.*  Nor was there any indication that the policy of performing the searches was influenced by any university official. *Id.*

There is not sufficient evidence to conclude that Wenrich was a willful participant in joint action with Medicaid.  Wenrich and Medicaid did not share the common goal of Wenrich's refusal or failure to perform the tubal ligation.  Medicaid later paid for Cynthia Provencio to receive a tubal ligation when she delivered her fifth child.  [Doc. 16 at 5]  Even if Wenrich had the goal of refusing to perform the procedure, there is no evidence to allow a rational juror to conclude that Medicaid shared this goal.  Nor was there sufficient coercion or influence to treat any refusal or failure to perform the tubal ligation by Wenrich as an action for which the state is responsible.

### Symbiotic Relationship

"State action is also present if the state 'has so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'"  *Gallagher*, 49 F.3d at 1451 (quoting *Burton*, 365 U.S. at 725).  This test, though based upon the analysis in *Burton*, was christened in *Moose Lodge*, in which the Supreme Court referred to "the symbiotic relationship between lessor and lessee that was present in *Burton*." *Id.* (quoting *Moose Lodge*, 407 U.S. at 175).

In *Burton*, the Court held that a privately owned restaurant which refused to serve an African-American customer was engaged in state action because it leased space in a parking facility owned by a state agency.  *Burton*, 365 U.S. at 717, 722-26.  The Court found that the commercial leases were a "physically and financially integral and, indeed, indispensable part of the State's plan to

operate its project as a self-sustaining unit." *Id.* at 723-24.  It noted that the "peculiar relationship" of the restaurant and the parking facility "confer[ed] on each a variety of mutual benefits." *Id.* at 724. The Court found that the "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Id.*  It held that the state had "so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity." *Id.* at 725.

Subsequent Supreme Court decisions have read *Burton* narrowly. *Gallagher*, 49 F.3d at 1451 (citing 1 MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION: CLAIMS, DEFENSES, AND FEES § 5.11, at 274 (2d ed. 1991) ("The present Supreme Court . . . has not found state action in any case that has relied upon *Burton*.")).  "The Court has held that extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action." *Id.*  "Post-*Burton* decisions have emphasized the *Burton* Court's finding that the restaurant was an indispensable part of a state project and that the state profited from the restaurant's discrimination." *Id.*

Approximately thirty to forty percent of the income generated by Wenrich's practice is for services related to patients covered by Medicaid.  [Doc. 13 Ex. A]  In *Rendell-Baker*, however, the Court distinguished *Burton* even where a far larger percentage of the private entity's revenues came from the state, noting that the private entity's status was not significantly different from many private companies contracting with the government.  *Rendell-Baker*, 457 U.S. at 32, 42-43.  Wenrich is no different from other medical providers receiving substantial funds from the government in return for medical services.  Nor is state regulation sufficient to find a symbiotic relationship between Medicaid

and Wenrich.  The relationship between Wenrich and Medicaid conferred some benefits on each party.  Any benefits from Provencio's services, though, were not an indispensable part of the financial success of Medicaid.  Further, Medicaid did not profit from Wenrich's decision; Medicaid paid for the same procedure when Cynthia Provencio delivered her fifth child.  [Doc. 16 at 5]  The facts of this case do not justify a finding of state action under the symbiotic relationship test.

### Comparison to Precedent

The Provencios also argue that the facts of this case are sufficiently similar to those in two other cases for a finding of state action.  They first argue that the Supreme Court's decision in *West v. Atkins* supports their contention that Wenrich was engaged in state action.  [Doc. 16 at 7-9]; *see* 487 U.S. 42.  They also argue that a finding of state action is supported by the Tenth Circuit's holding in *Nieto v. Kapoor.*  [Doc. 16 at 9-11]; *see Nieto*, 268 F.3d 1208.

In *West*, an inmate sued a private physician who provided medical care to inmates under a contract with the state.  *West*, 487 U.S. at 43-45.  He alleged that even though the physician acknowledged that surgery would be necessary to treat his condition, the physician refused to schedule it.  *Id.* at 44.  The inmate was not allowed to see a physician of his own choosing due to his administrative classification.  *Id.*  He sued under § 1983 for violation of his Eighth Amendment right to be free of cruel and unusual punishment, alleging that the physician was deliberately indifferent to his medical needs by failing to provide adequate treatment.  *Id.* at 45.

The Court held that the physician acted under color of state law for purposes of § 1983 when he treated the inmate's injury.  *Id.* at 54.  The Court first rejected the court of appeals' reliance on *Polk County v. Dodson*, which held that a public defender did not act under color of state law when representing a defendant in a criminal proceeding because his role was independent of and in

18

opposition to the state.  *Id.* at 50; *Polk County v. Dodson*, 454 U.S. 312 (1981).  The Court distinguished *Polk County* because, in contrast to the public defender, the physician had a cooperative relationship with the prison officials.  *Id.* at 50-51.

The Court stated that its holding was implicit in its decision in *Estelle v. Gamble*, which held that "deliberate indifference to a prisoner's serious medical needs, whether by a prison doctor or a prison guard, is prohibited by the Eighth Amendment."  *Id.* at 48, 54; *see Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  It then quoted *Estelle* for the proposition that inmates must rely on prison officials to treat their medical needs, and if the prison officials fail to do so "those needs will not be met."  *West*, 487 U.S. at 54 (quoting *Estelle*, 429 U.S. at 103).  The Court noted that under state law the inmate could receive treatment only from physicians provided by the state.  *West*, 487 U.S. at 55.  It  rejected the argument that the fact that the physician was employed by contractual arrangement altered the analysis.  *Id.* at 55-56.  The Court stated, "It is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law."  *Id.* at 56.

The Provencios argue that "[i]ndigent persons in our State are in exactly the same position [as the inmates in *West*] with respect to medical care needed to ensure that they can exercise their constitutionally protected right to choose whether or not to undergo permanent sterilization."  [Doc. 16 at 7-9]  They contend that citizens who rely on public assistance will not have access to sterilization without "mutual cooperation and trust between the state and private physicians."  *See id.* at 8.

The Provencios' comparison of this case to *West* does not withstand scrutiny.  The Provencios

19

had a choice of physicians [*see* Doc. 16 at 12], although this choice may have been more limited than patients who were not enrolled in Medicaid.  The inmate in *West* could not choose his physician. *West*, 487 U.S. at 44.   Further, *West* distinguished the facts of that case from the ordinary doctor-patient relationship. *Id.* at 56 n.15.  The physician in *West* "carried out his duties at the state prison within the prison hospital." *Id.*  The Court noted that "prisons and jails are inherently coercive institutions that for security reasons must exercise nearly total control over their residents' lives and the activities within their confines." *Id.*  "[T]hese factors can, and most often do, have a significant impact on the provision of medical services in prisons." *Id.*  Though they relied on the state to pay for Cynthia Provencio's sterilization procedure, the Provencios were not in custody.  The provision of health care to Medicaid recipients does not require the same degree of cooperation between state officials and private physicians as does the provision of health care to inmates.  The Provencios' analogy to *West* is insufficient for a finding of state action.

The Provencios also compare the facts of this case to those in *Nieto v. Kapoor*. [Doc. 16 at 9-12] ; *See Nieto*, 268 F.3d 1208.  In *Nieto*, the Tenth Circuit held that the facts were sufficiently similar to those in *West* to support a finding of state action. *See id.* at 1216.  The Tenth Circuit reasoned that "[w]hile not 'incarcerated' in their jobs, [the employees] could not choose to whom they would answer." *Id.* at 1216.  It noted that hospital hierarchies are well-established and that the medical director was "the only person to whom [the employees] could look for orders and training." *Id.*  It also stated that just as the outsourcing of medical treatment in *West* did not relieve the state of its obligation to provide adequate medical treatment to inmates, hiring a private doctor to perform supervisory duties did not relieve the state of its duty to provide equal protection to its employees. *Id.*

20

The facts of this case do not justify a finding of state action based on a comparison to *Nieto*. The Provencios emphasize that the Tenth Circuit held that the state could not outsource its duty to provide equal protection to its employees.  [Doc. 16 at 9-10]  However, the facts here are too removed from those in *Nieto* for the language the Provencios cite to bear the weight they ascribe to it. The Provencios state that they were "just as 'incarcerated' in having to go to Defendant or someone like him as were the employees in [*Nieto*]."  [Doc. 16 at 12]  There were others, though, to whom the Provencios could look for medical care.  As they suggest, they could have gone to "someone like [Wenrich]."  *Id.*  The Provencios were not as "incarcerated" as were the employees in *Nieto*.  A comparison of the facts of this case and those in *Nieto* fails to demonstrate that Wenrich was a state actor.

### Conclusion

I conclude that a refusal or failure by Wenrich to complete the tubal ligation is not "fairly attributable to the State."  *See Beedle*, 422 F.3d at 1065.  There is no genuine issue of material fact which would preclude granting summary judgment.  Because Wenrich was not a state actor, he is entitled to judgment as a matter of law.  I will therefore dismiss the Provencios' § 1983 claims. Having determined that Wenrich was not a state actor, I need not address the first prong of *Lugar*. *See Barnard*, 720 F.2d at 1189-90.  I also need not determine whether Wenrich's alleged conduct violated any of the Provencios' constitutional rights.  *See id.*

### THE PROVENCIOS' STATE LAW CLAIMS

The Provencios assert what appear to be state law claims for wrongful conception and battery, and they seek punitive damages.  [Doc. 1 at 4-5]  A court may decline to exercise supplemental jurisdiction over an otherwise unrelated claim when "the district court has dismissed all claims over

21

which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  When a federal claim no longer supports

supplemental jurisdiction, the ordinary response will be to dismiss the state claims without prejudice.

*See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir. 1997);

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Because I will dismiss the Provencios'

federal claims, I decline to exercise jurisdiction over their state law claims and will dismiss them

without prejudice.

### DISPOSITION

    IT IS THEREFORE ORDERED that Wenrich's Motion for Summary Judgment [Doc. 12]

is GRANTED.  IT IS FURTHER ORDERED THAT the Provencios' § 1983 claims are DISMISSED

WITH PREJUDICE and their state law claims are DISMISSED WITHOUT PREJUDICE.


_____

William P. Lynch
United States Magistrate Judge


A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.    22

NOTICE:  THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.
Darla Michelle BLOOMER, Plaintiff-Appellant,
v.
NORMAN REGIONAL HOSPITAL, Defendant-Appellee,
and
Kevin W. Hubbard, DO, Individually; Ronald L. Heim, DO, Individually; Robert B. McCloy, MD, Individually; Darrel L. Stout, MD, Individually; Jerry McCall, MD, Individually; William G. Wiggs, MD, Individually; Eric Wollman, MD, Individually; H. Jackson Woodward, MD, Individually; H. Jackson Woodward, MD, Inc.; Robert D. McCloy, Jr., MD, an Oklahoma Professional Corporation, Defendants.
**No. 99-6074.**
July 12, 2000.

Before BRORBY, ANDERSON, and MURPHY, Circuit Judges.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

ANDERSON

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed.R.App.P. 34(f); 10th Cir.R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Darla Michelle Bloomer appeals the district court's dismissal, for lack of subject matter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jurisdiction, of her claims against the Norman Regional Hospital (Hospital) under the Emergency Medical Treatment and Women in Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, and the court's refusal to exercise supplemental jurisdiction over her state claims against the remaining defendants. We hold that although plaintiff's federal claims were not legally immaterial, she failed to put forth facts supporting the exercise of federal jurisdiction, requiring vacation of that portion of the district court's order dismissing her EMTALA claims and remanding for entry of summary judgment in favor of the Hospital on the claims.

 Between March 1, 1996 and March 15, 1996, plaintiff sought treatment on six occasions from either the Norman Regional Hospital or its affiliated clinic. Plaintiff complained of neck and back pain, blurred vision, numbness, difficulty hearing, and high blood pressure, and informed medical personnel that her symptoms were increasing in severity. On each occasion, plaintiff was examined and discharged. On March 15, plaintiff was hospitalized for six days. She has been diagnosed with pseudotumor cerebri, and is now totally blind.

 Plaintiff brought this action against the Hospital, alleging it violated the EMTALA, by:
 [failing to] provide an appropriate medical screening and/or examination; [failing to] provide stabilizing medical treatment; [failing to] properly refer [her] for her medical condition; [failing to] utilize the staff available to the [Hospital] to perform its duties under the EMTALA, and ... discharg [ing] (which constitutes a 'transfer' under the EMTALA) [her] while [she] was suffering under an unstablized (sic) emergency medical condition.
 Appellant's App. at 13-14. Plaintiff brought supplemental medical malpractice claims against the Hospital and the treating health care providers.

 The Hospital moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), arguing the district court lacked jurisdiction over the EMTALA claims. Attaching documentary evidence, the Hospital argued that plaintiff failed to raise EMTALA claims because she did not show (1) that it "dumped" her, by transferring her or refusing to treat her because she was indigent, or (2) that it knew of an unstabilized emergency medical condition when it discharged her. *See* Appellant's App. at 30-31. The Hospital argued that the attached evidence showed extensive efforts to treat plaintiff on several occasions, and that such efforts negated a dumping claim. Instead, the Hospital argued, plaintiff's claims sounded in malpractice, which was not within the ambit of the federal statute.

 **2** Plaintiff's response discussed whether the motion to dismiss could be maintained under Rule 12(b)(1), objected to converting the motion to one under Rule 12(b)(6), and discussed converting the motion to one for summary judgment under Rule 56(c). *See* Appellant's App. at 57-58. Plaintiff also attached documentary evidence to her response. The district court dismissed the action for lack of subject matter jurisdiction under Rule 12(b)(1), holding that plaintiff's EMTALA claims were merely negligence claims, and that therefore they were immaterial and were raised only to invoke federal jurisdiction. We review the district court's determination of its subject matter jurisdiction de novo. *See Holt v. United States, 46 F.3d 1000, 1003 (10th Cir.1995)*.

 When a complaint is drawn to rely directly upon a federal statute, so that the question of the court's jurisdiction is intertwined with the merits of the case, the general rule is that a federal court possesses jurisdiction and should decide the case on its merits. *See Bell v. Hood, 327 U.S. 678, 681- 83, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Davoll v. Webb, 194 F.3d 1116, 1129 (10th Cir.1999); Holt, 46 F.3d at 1003*. Under these circumstances, the court should resolve its jurisdictional inquiry either "under Federal Rule of Civil Procedure 12(b)(6) or, after proper conversion into a motion for summary judgment, under Rule 56." *United States ex. rel Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1159 (10th Cir.1999)*. There are two exceptions to this rule: (1) when the alleged federal claim is immaterial and is made solely to obtain jurisdiction, or (2) when the claim is insubstantial and frivolous. *See Bell, 327 U.S. at 682- 83; Davoll, 194 F.3d at 1129*.

 Here, plaintiff drafted her complaint to seek recovery directly under the provisions of a federal statute, the EMTALA. The district court refused to convert defendant's motion to dismiss to a merits-based motion, however, upon finding that plaintiff's EMTALA claims were immaterial. We conclude that her EMTALA claims were not immaterial.

 Under the EMTALA, a hospital must provide to all individuals arriving in the emergency room for examination and treatment "an appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a). A hospital is further prohibited from transferring (or discharging) a patient before his/her emergency medical condition is stabilized. *See id., § 1395dd(c)*. Although we have held that this statute was not enacted to provide a federal malpractice remedy, *see Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir.1994)*, the EMTALA was drafted broadly,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the issues of whether plaintiff was screened appropriately and whether she was released before her condition was stabilized necessarily overlap with malpractice issues. This overlap does not make plaintiff's EMTALA claims inconsequential or immaterial. The district court should not have dismissed this case, therefore, under Rule 12(b)(1), but should have converted defendant's motion to dismiss to a merits-based motion under Rule 12(b)(6) or Rule 56(c).

**3** Because defendants' motion to dismiss did not simply attack the facial validity of the complaint, but instead challenged the factual allegations supporting the existence of subject matter jurisdiction, and because both parties submitted affidavits and other evidentiary material, the motion should have been treated as one for summary judgment under Rule 56(c). *See Spectrum Emergency Care, Inc., 190 F.3d at 1159-60; United States ex. Rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 (10th Cir.1996).* Plaintiff's response to the motion demonstrates she was aware that it should be converted to a Rule 56 motion for summary judgment. *See* Appellant's App. at 58, 63-64. As plaintiff had notice of the proper procedure and in fact attached documentary evidence to her response, we exercise our plenary power to consider the Hospital's motion as a motion for summary judgment. *See Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1496 (10th Cir.1993)* (holding plaintiffs had notice of conversion when they were first to point out need to convert motion, submitted evidentiary materials, and did not object to defendant's submission of materials).

Although a conversion of the Hospital's motion yields a merits-based decision, we have held plaintiff's burden of proof is "essentially the same--[she] must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *Spectrum Emergency Care, Inc., 190 F.3d at 1160 n. 5; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)* (noting burden of proving jurisdictional facts remains on the party invoking federal jurisdiction throughout the litigation, and that at the summary judgment stage, the plaintiff cannot "rest on ... mere allegations, but must set forth by affidavit or other evidence specific facts, ... which for purposes of the summary judgment motion will be taken to be true") (quotations omitted); *Cache Valley Elec. Co. v. State of Utah Dep't of Transp., 149 F.3d 1119, 1124 (10th Cir.1998)* (holding "at summary judgment, it is a plaintiff's burden to adduce evidence sufficient to establish necessary jurisdictional facts" and, thus, plaintiff "may not establish standing by

merely hypothesizing"), *cert. denied, 526 U.S. 1038, 119 S.Ct. 1333, 143 L.Ed.2d 498 (1999).*

We have clearly defined the facts necessary to sustain an EMTALA claim in our prior cases. In *Repp, 43 F.3d at 522 & n. 4,* we held "a hospital violates section 1395dd(a) [only] when it does not follow its own standard [screening] procedures," and that "[a] court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." And in *Urban ex rel. Urban v. King, 43 F.3d 523, 526 (10th Cir.1994),* we held that to show a violation under 1395dd(c), a plaintiff must show that the Hospital actually knew of the patient's emergency medical condition. These then are jurisdictional facts which plaintiff bore the burden of proving.

**4** The operative inquiry is whether, viewing the tendered evidence and all reasonable inferences in plaintiff's favor, she has raised a genuine issue of fact regarding these jurisdictional facts. The existence of a "scintilla of evidence" in favor of the non-moving party is not enough to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).*

Plaintiff has not raised a genuine issue as to whether the Hospital failed to follow its own screening procedures. She did not submit a Hospital policy or suggested what procedures were omitted. *See, e.g., Williams v. Birkeness, 34 F.3d 695, 697 (8th Cir.1994)* (holding plaintiffs failed to raise a triable issue whether patient was treated differently than others presenting the same symptoms, which was an "essential element of a claim under § 1395dd(a)," and noting that hospital did not bear the burden of showing a uniform screening procedure).

The fact that plaintiff received different treatment each time she sought medical attention does not, in itself, create an inference that the Hospital diverged from its ordinary screening procedures. A hospital would not be expected to duplicate particular screening procedures, such as a CT scan, when a patient is seen several times over a short period of time. What is appropriate screening on the patient's first visit may well be different by the fourth visit. In addition, we note that plaintiff presented different complaints on her visits, focusing sometimes on her back and neck, sometimes on her chest, and sometimes on her head and vision. *See* Appellant's App. at 76 (3/1/96--severe headache, blurry vision, difficulty hearing, neck pain, blood pressure at 190/138), at 77 (3/7/96--neck and back pain, swishing in ears, headache, difficulty sleeping, blurry vision left eye), at 78, 80 (3/9/96--

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

severe headache, neck ache, mid and upper back pain, complained her vision blurred "off and on when her blood pressure goes up", tenderness of spine and muscle tautness in left lumbar region), at 82 (3/10/96--dizziness, chest pain that increases upon inhalation), at 84 (3/11/96--low back pain that is improving, decreased vision in left eye), at 85 (3/14/96--back and neck pain that radiates to right knee, numbness in back and left hand, blindness in left eye and decreased vision in right eye).

Further, plaintiff did not submit any evidence demonstrating that the Hospital had notice she was suffering from an emergency medical condition. It is not enough to claim the Hospital "should have known" of her condition, plaintiff was required to raise a triable issue regarding the Hospital's actual knowledge of her unstabilized condition. *See Urban,* 43 F.3d at 526.

Because plaintiff failed to raise a triable issue regarding the existence of jurisdictional facts under the EMTALA, the district court should have granted summary judgment in favor of the Hospital. The district court's decision to decline supplemental jurisdiction need not be disturbed, however, as the court's reasoning is sound regardless of whether the EMTALA claims are dismissed procedurally under Rule 12(b)(1) or on their merits under Rule 56.

**5** The judgment of the United States District Court for the Western District of Oklahoma is VACATED, and the case is remanded for entry of summary judgment in favor of the Hospital on plaintiff's EMTALA claims.

**Briefs and Other Related Documents (Back to top)**

• 99-6074 (Docket) (Feb. 17, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,
Tenth Circuit.
Bartlett ELLIOTT, Plaintiff-Appellant,
v.
CHRYSLER FINANCIAL, Defendant-Appellee.
**No. 05-2073.**

Sept. 2, 2005.

**Background:** Borrower brought action against lender, alleging that lender violated his constitutional rights by unlawfully seizing vehicle. The United States District Court for the District of New Mexico granted lender's motion to dismiss.

**Holdings:** The Court of Appeals, McConnell, Circuit Judge, held that:

(1) district court lacked federal subject matter jurisdiction, and

(2) district court lacked federal question jurisdiction.
Affirmed.

West Headnotes

**[1] Federal Courts 222**
170Bk222 Most Cited Cases
Lender's merely following procedure established by state law for repossession of vehicle when not all payments were allegedly made did not transform private party's activity into state action, and thus, district court lacked federal subject matter jurisdiction over borrower's action against lender, alleging that repossession was an unlawful seizure under Fourth Amendment. U.S.C.A. Const.Amend. 4; 28 U.S.C.A. § 1343(3).

**[2] Federal Courts 222**
170Bk222 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lender's merely following procedure established by state law for repossession of vehicle when not all payments were allegedly made did not transform private party's activity into state action under civil rights statute, and thus, district court lacked federal question jurisdiction over borrower's action
against lender, alleging that repossession was an unlawful seizure under Fourth Amendment. U.S.C.A. Const.Amend. 4; 28 U.S.C.A. § 1331; 42 U.S.C.A. § 1983.

**\*767** Bartlett Elliott, Belen, NM, pro se.

Andrew J. Simons, Sutin, Thayer & Browne, Albuquerque, NM, for Defendant-Appellee.

Before SEYMOUR, HARTZ, and McCONNELL, Circuit Judges.

### ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

McCONNELL, Circuit Judge.

 Plaintiff Bartlett Elliott filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendant Chrysler Financial violated his constitutional rights by unlawfully seizing his vehicle. The district court granted Chrysler Financial's motion to dismiss for lack of subject matter jurisdiction. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

 On December 22, 2004, agents of Chrysler Financial repossessed Mr. Elliott's 2000 Chrysler Voyager minivan while it was parked behind his home. Mr. Elliott contends that this repossession was an unlawful seizure in violation of the Fourth Amendment. He filed a pro se complaint alleging that Chrysler Financial and its agents violated his constitutional rights and is seeking one million dollars in damages. The complaint asserted a claim under 42 U.S.C. § 1983 with jurisdiction under 28 U.S.C. § 1343(3).

 Chrysler Financial moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(1), (6). The magistrate judge, hearing the case by consent of the parties, dismissed the complaint for lack of subject matter jurisdiction,

holding that federal question jurisdiction was lacking because the claim does not arise under federal law, that § 1983 does not provide jurisdiction because the facts in the complaint do not identify any action taken under color of state law, and that diversity jurisdiction does not exist because the complaint does not allege a state of citizenship for Chrysler Financial.

 [1] We review the dismissal for lack of subject matter jurisdiction de novo. *See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1206 (10th Cir.1999).* We liberally construe pro se appellants' filings, *Hunt v. Uphoff, 199 F.3d 1220, 1223 (10th Cir.1999),* but we may not advocate on behalf of the litigant. *Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir.1997).* Because Mr. Elliott asserted jurisdiction **\*768** only under § 1343, the state action requirement is an element of Mr. Elliott's cause of action as well as a jurisdictional prerequisite. *Compare* 42 U.S.C. § 1983 *with* 28 U.S.C. § 1343(3). Before *Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998),* we analyzed issues common to jurisdiction and the merits under Rule 12(b)(6). *See Pringle v. United States, 208 F.3d 1220, 1222 (10th Cir.2000)* (per curiam) (quoting *Holt v. United States, 46 F.3d 1000, 1003 (10th Cir.1995)*). After *Steel Co.,* the better practice is to determine jurisdiction first, though in this case it amounts to the same thing. *See Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 581-82, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976)* (explaining that the state action elements in § 1343 and § 1983 were "deemed to coincide"); *cf. City of Kenosha v. Bruno, 412 U.S. 507, 513-14, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973)* (finding no jurisdiction under § 1343 because the municipality was not a "person").

 To establish subject matter jurisdiction under § 1343, the plaintiff must show that the defendant acted "under color of any state law." *See* 28 U.S.C. § 1343(3). To satisfy the state action requirement, "the party charged with the deprivation must be a person who may fairly be said to be a state actor ... because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)* (holding that a private party did not act under color of state law in a prejudgment attachment of the debtor's property if the creditor acted contrary to state policy); *Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)* (explaining that private action supports a § 1983 claim only if it "may be fairly treated as that of the State itself"); *Pino v. Higgs, 75*

F.3d 1461, 1465 (10th Cir.1996) (noting that private
action must be "fairly attributable to the state").

In his complaint, Mr. Elliott alleges that agents of
Chrysler Financial improperly repossessed his vehicle
for failure to make timely payments, when in fact he
had made all payments on the account. Repossession
is governed by state law. *See* N.M. Stat. Ann. § 55-9-
609 (establishing procedures for repossession of
collateral by secured creditors). Merely following a
procedure established by state law does not transform
a private party's activity into state action. *Scott v.
Hern,* 216 F.3d 897, 906-07 (10th Cir.2000); *see also
Kirksey v. Theilig,* 351 F.Supp. 727 (D.Colo.1972)
(holding that self-help repossession of an automobile
by a private party is not action under color of state
law). Section 1343 is the sole basis of jurisdiction
asserted in Mr. Elliott's complaint; however, none of
his factual allegations support the conclusion that the
government played a part in the repossession. Mr.
Elliott therefore fails to invoke federal subject matter
jurisdiction.

[2] Mr. Elliott's claim fares no better on alternative
grounds of jurisdiction not asserted in his complaint.
Ordinarily, § 1983 plaintiffs assert federal question
jurisdiction under 28 U.S.C. § 1331, *see Grable &
Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* ---
U.S. ----, 125 S.Ct. 2363, 2366, 162 L.Ed.2d 257
(2005), and the state action requirement is treated only
as an element of the claim. *See West v. Atkins,* 487
U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)
("To state a claim under § 1983, a plaintiff must
allege the violation of a right secured by the
Constitution and laws of the United States, and must
show that the alleged deprivation was committed **769**
by a person acting under color of state law."). 
Although § 1331 would provide subject matter
jurisdiction, Mr. Elliott's complaint fails to state a
claim upon which relief can be granted because it fails
to establish state action. The district court also
considered the possibility of diversity jurisdiction
under 28 U.S.C. § 1332, but correctly found
jurisdiction lacking because the complaint failed to
allege jurisdictional facts.

Because the district court lacked subject matter
jurisdiction over Mr. Elliott's claim, we AFFIRM the
magistrate judge's order dismissing the complaint.

149 Fed.Appx. 766

**Briefs and Other Related Documents (Back to
top)**

• 05-2073 (Docket) (Mar. 23, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Only the Westlaw citation is currently available.

United States District Court,
D. New Mexico.
Beverly JORNIGAN, Dwight Ward, and Jon Moran,
Plaintiffs,
v.
NEW MEXICO MUTUAL CASUALTY
COMPANY, and Warren Smalley, Johnny Suarez,
Paul
Cannizarro, Deborah Payne, Karen Alarid, Raymond
Perovich, Ted Knight, Bill
Garcia, Fabian Chavez, Charles Duke Colkett, Ron
Moshel, Brian Stokes, Nestor
Romero, and Eric Serna, in their individual
capacities, Defendants.
**No. CIV 03-0813 JB/ACT.**

April 19, 2004.
Paul J. Kennedy, Mary Y.C. Han, Adam Baker,
Kennedy & Han, P.C., Albuquerque, New Mexico, for
the Plaintiffs.

John B. Pound, Herrera, Long, Pound & Komer, P.A.,
Santa Fe, New Mexico, for Defendants Eric Serna and
Nestor Romero.

Douglas A. Baker, Zachary L. McCormick, Modrall,
Sperling, Roehl, Harris & Sisk, P.A., Albuquerque,
New Mexico, for Defendant Warren Smalley.

Geoffrey D. Rieder, Travis G. Jackson, Maestas,
Reider, & Suggett, P.C., Albuquerque, New Mexico
and John Wentworth, Jerry Todd Wertheim, Jones,
Snead, Wertheim & Wentworth, P.A., Santa Fe, New
Mexico, for Defendants New Mexico Mutual Casualty
Company, Johnny Suarez, Paul Cannizarro, Deborah
Payne, Karen Alarid, Raymond Perovich, Ted Knight,
Bill Garcia, Fabian Chavez, Charles Duke Colkett,
Ron Moshel, and Brian Stokes.

*MEMORANDUM OPINION AND AMENDED
ORDER* [FN1]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1. On April 13, 2004, the Court entered an Order disposing of this motion. *See* Order, filed April 13, 2004 (Doc. 73). On April 15, 2004, the Court held a telephonic conference during which it informed counsel that it would be modifying its Order. This opinion more fully explains the Court's rationale for its rulings and sets forth the Amended Order.

BROWNING, J.

*1 THIS MATTER comes before the Court on Defendants New Mexico Mutual Casualty Company ("NMMCC"), Johnny Suarez, Paul Cannizarro, Deborah Payne, Karen Alarid, Raymond Perovich, Ted Knight, Bill Garcia, Fabian Chavez, Charles Duke Colkett, Ron Moshel, and Brian Stokes' Motion to Dismiss, filed November 26, 2003 (Doc. No. 21). The primary issue is whether the Court should dismiss Counts II (Section 1983--Equal Protection), III (Section 1983--Due Process), VI (Breach of Contract), VII (Breach of Implied Contract), and VIII (Negligence) of the Plaintiffs' Complaint for failure to state a claim upon which relief can be granted. Because the Court finds that the Individual NMMCC Defendants are public officials and thus state actors, and because the Court finds that NMMCC is a state agency or at least a private entity so intertwined with the State as to constitute a state actor, and because the Plaintiffs may have had a protected property interest in their continued employment at some relevant date, the Court will deny the motion with respect to the Plaintiffs' § 1983 claims. Because the Court also finds that contracts containing volume-based compensation provisions are not enforceable unless reviewed and not disapproved by the superintendent of insurance, it will grant the motion with respect to the Plaintiffs' claims for breach of express and implied contracts to the extent that the Plaintiffs rely upon contracts containing such provisions. [FN2] Because the Court finds that the New Mexico courts recognize a cause of action for negligent supervision, and that Jornigan has adequately alleged such a claim against NMMCC, the Court will deny the motion with respect to Jornigan's negligence claim.

FN2. To the extent that the Plaintiffs base their allegations upon contracts that do not contain volume-based compensation provisions, such claims are not at issue in this motion.

*BACKGROUND*

1. The Parties

This is an employment relations case involving NMMCC, numerous present and former directors and employees of NMMCC, and two employees of the New Mexico Department of Insurance ("DOI"). NMMCC is an insurance carrier that the New Mexico Legislature established by statute, the New Mexico Employers Mutual Company Act (the "Act"), to fill a void in the workers' compensation insurance field. *See* NMSA 1978 § 52-9-1 to § 52-9-25 (2003 Replacement Pamphlet). NMMCC was incorporated on March 21, 1991, and the State licensed NMMCC to transact insurance business on December 31, 1991.

The New Mexico Legislature determined that small and medium-sized employers "can face serious obstacles in securing insurance at reasonable rates in the private voluntary market." NMSA § 52-9-2(B). Because "workers' compensation and occupational disease disablement insurance premiums and costs [were] at a critically high level that threaten[ed] the health of New Mexico's economy," NMSA § 52-9-2(D), the Legislature created NMMCC as "a nonprofit, independent, public corporation for the purpose of insuring employers against the risk of liability for payment of benefits claims to workers," NMSA § 52- 9-4.

The Act established a nine member Board of Directors (the "Board") to oversee the company. *See* NMSA § 52-9-5(A). The Board has "the same power, authority and jurisdiction as that authorized by law for the governing body of a private insurance carrier." NMSA § 52-9-5(H). Pursuant to the Act, the governor appointed, with the consent of the senate, the initial eight directors of the Board, who in turn selected the president. *See* NMSA § 52-9-5(C). Thereafter, by law, vacancies on the Board are filled in a manner to ensure that, at all times, the Board is comprised of five members who the governor of New Mexico appoints; three members who the company's policyholders elect; and the president, who the other eight members of the Board select. *See* NMSA § 52-9- 5(D); NMSA § 52-9-16. The governor may not remove a director he appointed unless the senate approves the removal by a two-thirds vote of its members. *See* NMSA § 52-9-5(E).

*2 By statute, Board members "are appointed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public officials of the state while carrying out their duties and activities under the Employers Mutual Company Act." NMSA § 52-9-6. In other respects, however, the Act distinguishes NMMCC from other government agencies. See NMSA § 52-9-21 ("The company shall not be considered a state agency for any purpose."). The Act provides that "[t]he company shall not receive any state appropriation," NMSA § 52-9-20, and "[t]he state shall not be liable for any obligations incurred by the company," NMSA § 52-9-8. The Act also states that:

All premiums and other money paid to the company, all property and securities acquired through the use of money belonging to the company and all interest and dividends earned upon money belonging to the company and deposited or invested by the company are the sole property of the company and shall be used exclusively for the operation and obligations of the company. The money of the company is not state money. The property of the company is not state property.

NMSA § 52-9-19.

Although the company does not receive any state appropriation, NMMCC's finances are not entirely separate from the State. When it created NMMCC, the Legislature stated: "It is the expressed intent of the legislature that the company shall *ultimately* become self-supporting." NMSA § 52-9-10(A)(emphasis added). If the superintendent of insurance finds that the company's assets are less than its liabilities and required reserves, he or she must "notify the governor, the president pro tempore of the senate, the speaker of the house of representatives and the legislative finance committee of the recommendations of the superintendent and any actions taken in response by the company." NMSA § 52-9-18. At the time the Legislature created NMMCC, it also "created in the state treasury a fund to be known as the 'employers mutual company loan fund.'" NMSA § 52-9-24. The Act also authorizes NMMCC to issue revenue bonds "to provide funds for the continued development and operation of the employers mutual company...." NMSA § 52-9-25(A). Such bonds "may be sold either at a public sale or at a private sale to the state investment officer or to the state treasurer." NMSA § 52-9-25(F).

The State regulates NMMCC in the same manner as it regulates private insurance companies. See NMSA § 52-9-21 ("The insurance operations of the company are subject to all of the applicable provisions of the Insurance Code in the same manner as those provisions apply to a private insurance company. The company is subject to the same tax liabilities and assessments as a private insurance company.").

The company shall be liable to the same extent as any private insurance company for the payments that are required to be made under Chapter 59A, Article 43 NMSA 1978 to protect against the insolvency of any other insurer of workers' compensation or occupational disease disablement. Likewise, the company shall receive the same benefits under those provisions as any other insurer of workers' compensation or occupational disease disablement.

**\*3** NMSA § 52-9-10(B). The company and the president have many of the same powers as their private counterparts. See NMSA § § 52-9-15 and 52-9- 16.

The Plaintiffs, Beverly Jornigan, Dwight Ward, and Jon Moran, are former executive officers and employees of NMMCC. See Complaint for Title VII Violations, Civil Rights Violations, and State Statutory and Common Law Claims ¶ 6, at 2, filed July 10, 2003 (Doc. 1)("Complaint"). Defendant Warren Smalley was at all relevant times to this action, and currently is, NMMCC's president and chief executive officer. See id. ¶ 8, at 2. Because of his position, he also sits on the Board. Jornigan was NMMCC's executive vice president and chief operating officer. See id. ¶ 33, at 6. She had been designated as CEO Smalley's successor upon his retirement.

Defendants Suarez, Cannizarro, Payne, Alarid, Perovich, Knight, Garcia, Chavez, Colkett, Moshel, and Stokes are or were, at all relevant times, members of the NMMCC Board, either at the time that the Plaintiffs were placed on administrative leave, or at the time the Plaintiffs' employment was terminated. See id. ¶ 9, at 2. Defendant Eric Serna is the superintendent of the New Mexico DOI and in this capacity supervised Defendant Nestor Romero, a DOI employee. See id. ¶ ¶ 10-11, at 2.

2. The Contracts

In 1997 and again in 2000, NMMCC entered into written employment contracts ("Contracts") with the Plaintiffs and Smalley. See id. ¶ ¶ 13, 20, at 3-4. The 2000 Contracts provided that they superseded all prior agreements. See id. ¶ 20, at 4. Both sets of Contracts were to continue "until the Employee resigns or is involuntarily terminated." Id. ¶ ¶ 14, 21, at 3-4. The Contracts provided that the Plaintiffs and Smalley would receive salaries for their work on behalf of NMMCC, Southwest Casualty Company, and Risk Watch, Inc., and additional compensation for work performed on behalf of Foundation Reserve Insurance Company. The Contracts provided that NMMCC could terminate the Plaintiffs only for cause and contained a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

severability clause. *See id.* ¶ ¶ 16, 23, at 3-4.

The Contracts also contained a provisions for additional compensation based on the volume of NMMCC's business transactions. The Contracts provided that:

Employee shall receive a bonus equal to 10% of salary (not to include performance incentive pay) when Foundation Reserve Insurance Company's in force premium volume reaches 17.5 million dollars. Thereafter, Foundation Reserve Insurance Company shall reward Employee with a bonus equal to 10% of present salary for every 3.5 million dollar increase in in force premium above the base 17.5 million dollars as stated in Foundation Reserve's monthly financial statements.

Exemplar Contract ¶  5, at 2. Because of these provisions, the Contracts were subject to review by the superintendent of insurance pursuant to NMSA § 59A-34-17.

NMMCC's counsel drafted the Contracts, and the Board approved them. *See* Complaint ¶ ¶ 17-18, 24, at 3-4. The DOI subsequently reviewed the 1997 Contracts as part of a periodic examination, and was aware of the Contracts and their content. *See id.* ¶ 19, at 3. The superintendent approved of the examination results in 2001. *See id.* The Plaintiffs do not allege that the superintendent approved the 2000 Contracts. In fact, in the fall of 2002, the DOI disapproved the 1997 and 2000 Contracts of Smalley, Jornigan, Ward, and Moran. *See id.* ¶ 49, at 8.

3. The Target Examination

**\*4** In the fall of 2002, the DOI conducted a "target examination" of NMMCC for the period of January 1, 1997 through July 31, 2002. *See id.* ¶  43, at 7. Romero wrote and/or supervised the writing of the target examination report. *See id.* ¶ 44, at 7. Serna was at all relevant times Romero's supervisor. *See id .*

The DOI's target examination alleged substantial wrongdoing by the senior executives, including a course of self-dealing which allegedly drove NMMCC's subsidiary, Foundation Reserve Insurance Company, to the verge of collapse. This alleged improper conduct included entering into executive contracts of employment with the Plaintiffs, which contained terms that allegedly required substantive review by the superintendent of insurance. *See* NMSA § 59A-34-17.

In discussing executive compensation in the final report, the examiner noted that NMMCC paid the executives approximately one million dollars in bonuses while the company lost almost six million dollars. *See* New Mexico Regulation Commission Report on Target Examination of New Mexico Mutual Casualty Company at 7 (dated October 2, 2002)("Target Examination Report"). The examiner further noted that, according to both national and regional studies, NMMCC paid "significantly higher compensation" than other companies in its peer group. *Id.* at 11. As an example of what the examiner determined was unreasonable compensation, the report reflects that Jornigan's pay went from $224,375 in 1998 to $460,107 in 2001. Ward enjoyed compensation growth from $189,311 in 1998 to $333,896 in 2001. Moran's compensation nearly doubled over the same period. *See id.*

In addition to finding the compensation unreasonable, the examiner discovered that NMMCC had not filed the executive contracts with the superintendent, as state law requires, and had therefore evaded mandatory scrutiny of the contracts. *See id.* at 5-7. Among other things, the report attacked the Plaintiffs' Contracts, stating that they had to be "filed with and not disapproved by the superintendent" under § 59A-34-17, because they provided for compensation based on the volume of premiums. Target Examination Report at 5-7. In conjunction with its response to the examination, NMMCC submitted the Contracts to the superintendent. *See id.* After review of the Contracts' terms, the superintendent disapproved the contracts "in their entirety," because they substantively violated § 59A-34-17C, which permits him to disapprove bonus premium contracts that contain excessive compensation clauses or are inequitable because they place the interests of the executives over those of the policyholders and shareholders of the company. *See id.* at 7.

The Plaintiffs allege that the target examination contains false and misleading statements harmful to the Plaintiffs. *See* Complaint ¶ 45, at 7. Among these are the allegedly false and unsupported statements that the Contracts, which the NMMCC Defendants' counsel drafted and the NMMCC Defendants approved, over-compensated the Plaintiffs or otherwise contained illegal or improper provisions. The Plaintiffs allege that Romero and Serna knew that the report contained multiple false and misleading statements regarding the Plaintiffs or consciously ignored these falsities. *See id.* ¶ 46, at 7. "New Mexico Mutual claims that it fired Plaintiffs at the direction of Defendant Serna, who is a public official." *Id.* ¶ 56, at 9.

4. The Claims

**\*5** The Plaintiffs allege a number of different claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in their Complaint. Only five of those claims are at issue in this motion. [FN3] All three Plaintiffs have sued all of the Defendants, including the State Defendants, for constitutional rights violations under 42 U.S.C. § 1983 (Counts II and III), asserting that the Defendants violated their rights to equal protection and due process of law. With respect to the NMMCC Defendants, the Plaintiffs argue that the company violated their due process rights by firing them without cause and without affording them a hearing. All three Plaintiffs have sued NMMCC and the individual Defendant Board members for breach of express and implied contract (Counts VI and VII) as a result of the Board's termination of the Plaintiffs' employment following the target examination. Finally, Jornigan alone asserts that NMMCC was negligent (Count VIII) in failing to prevent Smalley from continuing to harass her.

> FN3. Jornigan's Title VII claims against NMMCC for hostile work environment, adverse employment action, and retaliation (Count I) are not at issue in this motion. The same is true for Jornigan's claim against the NMMCC Defendants under the New Mexico Human Rights Act (Count IV), and all three Plaintiffs' claims against NMMCC for wrongful discharge (Count V).

 The NMMCC Defendants move pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing Counts II (Section 1983--Equal Protection Violation), III (Section 1983--Due Process Violation), VI (Breach of Express Contract), VII (Breach of Implied Contract), and VIII (Negligence) of the Complaint, arguing that the allegations contained in these counts fail to state a claim upon which relief may be granted.

### LEGAL ANALYSIS

 This is a motion to dismiss, not a motion for summary judgment. Based upon the allegations in the Complaint, the Plaintiffs have sufficiently alleged state action against both the Individual Directors and against NMMCC. Moreover, while the written contracts containing the volume-based compensation provisions, as well as any implied contracts containing such provisions, are void and unenforceable, NMMCC may have entered into new contracts after that date which did not require DOI approval. Finally, the Complaint sufficiently alleges a claim for negligent supervision. Accordingly, the Court will grant the motion in part and deny it in part.

 I. *THE COURT WILL TREAT THE MOTION AS ONE TO DISMISS AND NOT AS ONE FOR SUMMARY JUDGMENT.*

 "When a federal court reviews the sufficiency of a complaint [under rule 12(b)(6) ], before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800 (1982). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. at 236. Thus, in considering a motion to dismiss for failure to state a claim, the Court must liberally construe the pleadings, accept as true all well-pleaded facts in the complaint, and draw all reasonable inferences in the plaintiff's favor. *See Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). The Court may dismiss the Complaint only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

 *6 The NMMCC Defendants have added a layer to the straightforward analysis that generally accompanies a rule 12(b)(6) motion, attaching two documents to their motion. The NMMCC Defendants' motion is accompanied by the target examination report that the superintendent of insurance adopted on October 7, 2002 and an exemplar of the 2000 Contracts between the Plaintiffs and NMMCC. Under certain circumstances, the Court may consider documents outside the complaint in the context of a rule 12(b)(6) motion to dismiss. *See, e.g., GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

 The NMMCC Defendants have titled this motion as one to dismiss under rule 12(b)(6), and the Plaintiffs do not generally dispute this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

characterization. The Plaintiffs nevertheless contend that the Defendants' attaching of the target examination report to its motion is ineffective and requires conversion of the motion to one for summary judgment. The Plaintiffs refer to this document in the Complaint. *See* Complaint ¶¶ 13-24, at 3-4; *id.* ¶¶ 43-50, at 7-8. The Plaintiffs base their claims, at least in part, on this document. But the Plaintiffs do not agree that the Defendants' copy of the target examination report is "indisputably authentic" or that it is "central" to the Plaintiffs' claims. *See GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d at 1384*.

As to the first prong, the DOI Defendants, and not the NMMCC Defendants, generated the target examination report, and the Plaintiffs are entitled to obtain a copy of the report directly from the DOI to verify its authenticity. Nevertheless, the Plaintiffs have not disputed the authenticity of the report attached. At the hearing on this motion, the Plaintiffs did not press this argument.

As to the second prong, the Plaintiffs contend that the report itself is not "central" to their claims, but merely the vehicle that the DOI and the NMMCC Defendants used to falsely accuse the Plaintiffs of wrongdoing. Unlike a contract, for example, the form and the existence of the document itself are irrelevant. Nevertheless, the form is what it is, and the fact that the target examination report includes alleged misrepresentations is important to the Plaintiffs' claims. The Court believes the Plaintiffs' reference to it in the Complaint is sufficient to satisfy the "central" standard.

The Plaintiffs correctly point out that the Court may, in its discretion, decline to consider this document, particularly if it is over- or underinclusive. *See Prager v. LaFaver, 180 F.3d 1185, 1189 (10th Cir.1999)*. The Plaintiffs argue that the target examination report is over-inclusive because it addresses matters having nothing to do with this lawsuit, and that it is under-inclusive because the Plaintiffs have alleged, and intend to prove, by testimony and other evidence gained in discovery, that the report is false and misleading. It is rare, however, that one document covers everything without some extraneous material. The Court will

exercise its discretion to consider this document.

**\*7** While the Court may consider a document properly attached to a motion to dismiss, it cannot blindly accept the unsupported statements as true. The Court remains bound by rule 12(b)(6)'s standards, which require the Court to accept as true all factual allegations in the complaint. *See Swanson v. Bixler, 750 F.2d at 813*. The Plaintiffs' Complaint alleges that, "[t]he target examination report is riddled with false and misleading statements harmful to Plaintiffs." Complaint ¶ 45, at 7. Thus, under rule 12(b)(6), the Court must accept as true that the target examination report is false and misleading in places.

Thus, while the Court will exercise its discretion to consider the target examination report, it will consider it in the context of the Plaintiffs' allegation that it is riddled with false and misleading statements. *See* Complaint ¶ 45, at 7. There is no need to convert the NMMCC Defendants' motion to one for summary judgment, to provide the Plaintiffs with notice of such conversion, or to afford the Plaintiffs an opportunity to collect and submit factual materials demonstrating the falsity of the target examination report. The NMMCC Defendants' reliance on the target examination report's substance in this motion to dismiss, for the limited purpose for which it is offered, is proper. [FN4]

FN4. The Plaintiffs do not appear to challenge the NMMCC Defendants' decision to attach an exemplar contract to the motion to dismiss.

II. *THE COURT WILL GRANT THE MOTION TO DISMISS THE PLAINTIFFS' CLAIMS FOR BREACH OF EXPRESS AND IMPLIED CONTRACT TO THE EXTENT THAT THOSE CLAIMS ARE BASED UPON CONTRACTS CONTAINING VOLUME-BASED COMPENSATION PROVISIONS SUBJECT TO REVIEW BY THE SUPERINTENDENT OF INSURANCE.*

Counts VI and VII of the Plaintiffs' Complaint allege claims for breach of express and implied contract against the NMMCC Defendants. The Plaintiffs' express contract claim is based on the written employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Contracts between the parties. The implied contract claim is based on assurances of continued employment that the Plaintiffs' allegedly received from the NMMCC Defendants during and after the target examination. Because the Court finds that the 1997 and 2000 written Contracts could not become effective until being reviewed, and not disapproved, by the superintendent, the Court finds that those contracts are unenforceable. Because the Court believes NMSA 1978 § 59A-34-17(A) does not allow implied contracts containing terms that would subject them to review by the superintendent, the Court will also dismiss the claims for breach of implied contract to the extent such contracts contain volume-based compensation provisions. The Court does not make any determination concerning the legal sufficiency of express or implied contracts that do not contain such provisions.

A. THE 1997 AND 2000 CONTRACTS ARE VOID AND UNENFORCEABLE.

The New Mexico Insurance Code provides that:

No domestic insurer shall make, amend or renew any contract ... if an officer, director or otherwise part of the insurer's management, is to receive any commission, bonus or compensation based upon the volume of the insurer's business or transactions, unless the contract is filed with and not disapproved by the superintendent.

**8** NMSA 1978 § 59A-34-17(A). Under the statute, the superintendent has broad authority to disapprove such contracts if, after substantive review, he finds that the contract:

(1) subjects the insurer to excessive charges;

(2) is to extend for an unreasonable length of time;

(3) does not contain fair and adequate standards of performance; or

(4) contains other inequitable provisions or provisions which impair the reasonable and proper interests of the insurer's stockholders, policyholders or members.

NMSA § 59A-34-17(C). By requiring the superintendent to review executive compensation agreements for these abuses, the New Mexico Legislature was trying to prevent executives in control of a company driving up premium receipts for personal gain without regard for the profitability of the business.

Although the Plaintiffs' Contracts gave bonuses based upon business volume, NMMCC did not file the Contracts with the superintendent before the target

examination. In the Target Examination Report, the investigator found that the Plaintiffs' 1997 and 2000 Contracts violated § 59A-34-17(A) because NMMCC did not submit them to the superintendent. In conjunction with the company's response to the report, NMMCC filed the Contracts with the superintendent. The superintendent then disapproved of the Contracts "in their entirety."

The Plaintiffs do not dispute that the Contracts providing for compensation based on volume of premiums are subject to NMSA § 59A-34-17(A). Nor do they allege that NMMCC immediately submitted the Contracts to the superintendent for review. The Plaintiffs contend, however, that the written Contracts are legal and binding.

"The general rule of law is that a contract made in violation of a statute is void[.]" Miller v. Ammon, 145 U.S. 421, 426 (1892). New Mexico courts have stated that, generally "a contract made in violation of a statute prescribing penalties is void." Eastland Financial Services v. Mendoza, 2002-NMCA-035, ¶ 8, 43 P.3d 375, 378. Although numerous cases address this principle, the Court's decision rests primarily on the language of the statute itself, which sets forth a general rule that "[n]o domestic insurer shall make ... any contract ... if an officer ... is to receive any ... compensation based upon the volume of the insurer's business or transactions[.]" NMSA § 59A-34- 17(A). There is only one statutory exception to that general rule: "the contract is filed with and not disapproved by the superintendent." Id.

Thus, the Court has before it employment contracts that violate the statute both procedurally and substantively. NMMCC did not meet the requirements of the statutory exception for making the Contracts, and the superintendent eventually rejected the substance of the Contracts. The Contracts violate both the letter of the statute and public policy behind it, and they are void and unenforceable.

The Plaintiffs try to avoid dismissal by pointing out that they have alleged that the 1997 Contracts fully comply with the statute. Section 59A-34-17(A) requires that certain contracts be "filed with and not disapproved by" the superintendent. The Plaintiffs contend that, construing their Complaint liberally, they have easily alleged that their 1997 Contracts satisfied this requirement. See Complaint ¶ 19, at 3 ("The Insurance Division subsequently reviewed the 1997 Employment Contracts as part of a periodic examination, and was fully aware of the contracts and their content. The Superintendent approved of the examination results in 2001.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*9** The Legislature did not state that contracts about which the superintendent knows and does not invalidate are valid and enforceable. The Legislature imposed a filing requirement. That filing requirement is the sole statutory exception to the rule prohibiting insurers from making contracts with provisions for volume-based compensation. NMMCC did not file the Contracts, under any normal interpretation of the statute, until after the target examination. A federal court should not re-write the state Legislature's statute. The 1997 Contracts are not valid or enforceable.

The Plaintiffs also point out that the Defendants admit that NMMCC eventually filed all of the Contracts with the DOI and argue that they have alleged that Serna did not have a valid statutory basis on which to disapprove the Contracts, which the Plaintiffs allege complied with § 59A-34-17(C). They also allege that Serna disapproved of the Contracts without providing the Plaintiffs with the hearing that the law requires. *See* Complaint ¶ ¶  48-49, at 8; NMSA § 59A-34-17(D). The Plaintiffs contend that, for both of these reasons, Serna's eventual disapproval of the Contracts was illegal and ineffective, and the Contracts became and remain enforceable. The Plaintiffs contend that the Court is bound by these allegations and their version of the facts must prevail.

The issues that the Plaintiffs raise regarding Serna's disapproval of the Contracts are questions of law. The Court is not bound by the Plaintiffs' legal conclusions. Whether Serna had statutory grounds to disapprove the Contracts and whether he needed to provide the Plaintiffs with a hearing are legal questions for the Court to decide.

With respect to the Plaintiffs' allegation that Serna lacked a statutory basis to disapprove the Contracts in their entirety, the Court does not believe that § 59A-34-17 limits the superintendent by allowing him to disapprove only the volume-based compensation provisions themselves. While it is true that those provisions trigger the applicability of the statute, the language of the statute contemplates disapproval of the *contract* rather than disapproval of the offending provision. *See* NMSA § 59A-34-17(C)("The superintendent shall disapprove any such *contract* ... if he finds that the contract [meets certain criteria].")(emphasis added). Thus, the Court finds that the superintendent did not exceed his statutory authority by disapproving of the Contracts in their entirety.

The Plaintiffs also contend that the superintendent's disapproval of their Contracts was ineffective because he failed to provide them with a hearing. The Court does not interpret the statute as requiring a hearing before the superintendent disapproves a contract that has not yet become effective. The statute provides that:

> The superintendent may, after a hearing held thereon, disapprove or withdraw his approval of any such contract theretofore permitted to become effective or amended or renewed, if he finds that the contract should be disapproved on any of the grounds specified in Subsection C of this section.

**\*10** NMSA § 59A-34-17(D)(emphasis added). If the superintendent has allowed a contract to become effective, either by declining to disapprove it or affirmatively approving it, he must provide a hearing before disapproving or withdrawing his approval of the contract. This portion of the statute does not apply to this case, because the superintendent was not dealing with a contract that he had previously "permitted to become effective." *Id.*

No provision of the statute appears to require a hearing before the superintendent disapproves a contract he is reviewing for the first time. Subsection A of the statute, which establishes the requirement of superintendent review of contracts containing provisions for volume-based compensation, does not mention a hearing. Instead, the last sentence of that subsection requires only that "[a]ny disapproval shall be delivered to the insurer in writing stating the grounds therefor." NMSA § 59A-34-17(A).

The statute's structure leads the Court to believe that the Legislature disfavored contracts containing volume-based compensation provisions. Subsection A generally prohibits such contracts, unless an insurer satisfies a specific statutory exception. Subsection C gives the superintendent broad discretion to reject such contracts if he finds them to be unreasonable or inequitable. Finally, Subsection D allows the superintendent to cancel such contracts even after he has allowed them to become effective. In light of the statute's structure and language, the Court finds that the superintendent did not have a statutory obligation to provide the Plaintiffs with a hearing before disapproving their Contracts. [FN5]

> FN5. The Plaintiffs contend that, while contracts made in violation of a statute are generally void, several exceptions exist. They argue that violation of a statute will not render a contract void if the Legislature did not intend such a result. In light of the Court's conclusion that the Legislature intended contracts made in violation of § 59A-34-17 to be void, the Court does not believe that it is necessary to perform a

separate analysis under this exception.

The Court believes that the statute is unusual in that it expressly precludes parties from entering into certain contracts. This characteristic distinguishes the statute from those at issue in the cases that the Plaintiffs cite in their Response. For example, in *Eastland Financial Services. v. Mendoza*, the New Mexico Court of Appeals upheld the validity of a contract despite that the contract violated a provision of the New Mexico Employee Leasing Act, which states that "[n]o person shall do business in the state as an employee leasing contractor unless the person is registered with the [regulation and licensing] department." *Eastland Financial Services v. Mendoza*, 2002-NMCA-035, ¶ ¶ 7, 13, 43 P.3d 375, 378-79 (citing NMSA 1978 § 60-13A-3). The defendant argued that the contract was unenforceable because the plaintiff had failed to register as the Employee Leasing Act required. The Employee Leasing Act contained both civil and criminal penalties for failure to register. *See* NMSA § § 60-13A-12 and 60-13A-13. Nevertheless, the Court of Appeals concluded that the contract at issue, "[a]lthough made in violation of [the statute], did not involve the type of illegality that automatically renders a contract void.... [T]he contract was not immoral in character, inherently inequitable, or made for an illegal purpose." *Eastland Financial Services v. Mendoza*, 2002-NMCA-035, ¶ 13, 43 P.3d at 379.

**\*11** The Plaintiffs also rely upon another New Mexico Court of Appeals case in which the court upheld the validity of a contract despite the fact that the parties had not complied with a statute that required submission of the contract to a state agency for review. *See Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.*, 84 N.M. 524, 505 P.2d 867 (Ct.App.1972). In *Sierra Blanca*, the court considered a statute that provided that the New Mexico Racing Commission "shall" approve contracts for the payment of money "by any licensee." NMSA § 60-6-2 (repealed). The plaintiff in that case was attempting to enforce an employment contract that the Racing Commission had not reviewed or approved. The court emphasized that the purpose of the contract was for employment; that this purpose was not immoral or illegal; and that the statute, by

requiring approval of contracts, actually presupposes and acknowledges their existence. *See id. at 536, 505 P.2d at 879*. The court noted that the penalty for failure to submit the contracts was not voiding the contract, but cancellation or revocation of the employer's racing license. *See id.*

The Contracts at issue here, like the contract in *Sierra Blanca*, are employment contracts. The similarities, however, end there. Unlike in *Sierra Blanca*, the statute that governs this case does not presuppose a contract. It states that "[n]o domestic insurer shall make ... any contract ... if an officer ... is to receive any ... compensation based upon the volume of the insurer's business[.]" NMSA § 59A-34-17. Rather than presuppose a valid contract, the statute prohibits such contracts. The Court sees a meaningful distinction between that language and the language the court addressed in *Sierra Blanca*. The statutory language before this Court goes directly to the heart of the validity of the Contracts and renders them unenforceable.

The Court believes that this case is different from the cases relied upon by the Plaintiffs. Those cases involved statutes that related to the subject matter of the contracts, but did not prohibit the parties from entering into the contracts. The statutory violations occurred because of some extraneous fact. In this case, however, the creation of the contract *was* the statutory violation. Accordingly, the Court finds that the Contracts are unenforceable.

The Plaintiffs try to avoid the force of the statute's language by arguing that § 59A-34-17 does not say that the contract is not effective until filed and not disapproved. The Plaintiffs emphasize the provision stating that "[t]he contract amendment or renewal shall become effective in accordance with its terms unless disapproved by the superintendent within thirty days after date of filing." NMSA § 59A-34-17(A). Relying on this provision, they contend that, on its face, the "effective" language only applies to "contract amendments and renewals," and not original contracts such as those at issue here. *See McCarthy v. New Mexico Mut. Cas. Co.*, Civ.2003-00137 (2d Jud. Dist.Ct.)(York, D.J.)("The language of NMSA § 59A-34-17(A) regarding effectiveness of a contract is limited to contract amendment or renewal.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*12** The Court does not believe that it needs to interpret the sentence of the statute containing the "effective" language. The previous sentence in the statute establishes that insurers cannot make contracts containing volume-based compensation provisions unless they satisfy the exception requiring submission to the superintendent. If a contract cannot be made, it cannot become "effective." [FN6]

FN6. Furthermore, unlike the first sentence of Subsection A, which deals with "mak[ing], amend[ing] or renew[ing]" contracts, the second sentence only deals with "contract amendment or renewal." Thus, even if the Court were to interpret the second sentence, it would not assist the Plaintiffs.

Finally, the Plaintiffs contend that, even if the Contracts fail as a matter of law, justice and equity should prevent the NMMCC Defendants from escaping their contractual obligations through their own dereliction of duty. The Plaintiffs argue that NMMCC was required to file the Plaintiffs' Contracts with the DOI. NMMCC's Board of Directors drafted, approved, and accepted the Plaintiffs' Contracts. The Plaintiffs contend that they had every reason to believe that NMMCC's President, Smalley, submitted the Contracts to the DOI.

The Plaintiffs contend that, given the situation, NMMCC, and not the Plaintiffs were at fault for any failure to file the Contracts with the DOI. The Plaintiffs argue that, in these circumstances, NMMCC cannot use its own wrongful act to escape its obligations under the Contracts. The Plaintiffs maintain that, if NMMCC is allowed to escape its legally binding obligations, as it is attempting to do, then any domestic insurer could entice employees into lucrative written contracts, fail to file them with the superintendent, and then refuse to pay employees for work performed. [FN7]

FN7. The Court notes that it does not view this case as one involving unjust enrichment. The Plaintiffs do not allege that they did not receive payment for the work they performed. It appears undisputed that NMMCC in fact paid the Plaintiffs under the Contracts for several years.

While the Court agrees that there may be times when equity requires the enforcement of a contract, this case involves a statute specifically prohibiting the making of the Contracts at issue. New Mexico courts have recognized that equitable principles cannot help a plaintiff where a contract is void. *See Buck v. Mountain States Investment Corp.,* 414 P.2d 491, 495, 76 N.M. 261, 266 (1966)("A court of equity will not withhold relief where it is necessary in the interest of justice and of sound public policy to enforce a contract *which is inhibited by statute, but is not declared void,* provided the parties are not in pari delicto.")(emphasis added). Thus, the Court finds that, because the Legislature could not have intended the result that the Plaintiffs seek, justice and equity do not require enforcement of the Contracts. Accordingly, the Court will grant the motion to dismiss the Plaintiffs claims for breach of the 1997 and 2000 Contracts.

**B. NEW MEXICO LAW DOES NOT ALLOW INSURERS TO ENTER INTO IMPLIED CONTRACTS PROVIDING FOR VOLUME-BASED COMPENSATION.**

The Plaintiffs' implied contract claims, found in Count VII, fail for the same reasons as the express contract claims. In support of an implied contract, the Plaintiffs suggest that, even if the written contracts themselves are void because the superintendent disapproved them, certain unnamed individual board members allegedly promised that NMMCC would continue to employ the Plaintiffs under the terms of the disapproved contracts. *See* Complaint ¶ 99, at 15 (alleging that the Plaintiffs were told that NMMCC "would continue to employ plaintiffs consistently with the terms of those contracts...."). This allegation in support of an implied contract is insufficient as a matter of law for at least two reasons.

**\*13** First, by statute, insurers cannot make agreements with terms such as those that the Plaintiffs seek to enforce unless they are submitted to the superintendent for review. *See* NMSA § 59A-34-17(A). This requirement implies that such contracts be in writing; if they were not written, they could not be submitted and reviewed. Thus, the statute does not permit implied contracts. Moreover, it appears undisputed that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

superintendent did not review the "implied contract," as required by statute.

Second, the superintendent disapproved such contracts "in their entirety" because the contracts violated NMSA § 59A-34-17. By raising the implied contract claim here, the Plaintiffs are suggesting that, even though the superintendent disapproved of the written contracts, the Plaintiffs privately agreed with individual NMMCC Defendants to do an end-run around the superintendent's disapproval of their contracts. Even if the Court assumes, as it must at this stage of the case, that the Plaintiffs and individual board members had such conversations, these verbal "contracts" intended to avoid the regulatory scheme would be contrary to the statute and contrary to public policy. Any implied contract is unenforceable. [FN8]

FN8. The Court's ruling applies to the implied contract claims only to the extent that those contracts include provisions subject to superintendent review. To the extent that the Plaintiffs rely on implied contracts that do not include volume-based compensation provisions, the Court does not intend to address those claims.

C. THE INDIVIDUAL BOARD MEMBERS WERE NOT PARTIES TO ANY CONTRACT AND ARE NOT LIABLE FOR ANY CLAIMED BREACH.

While the Court has found that no enforceable express or implied contract with volume-based compensation provisions exists, even if the Court assumes that an enforceable contract exists, the Plaintiffs cannot recover against the individual board members for any such breach because the board members were not principals to the contract. Section 52-9-6 NMSA states: "[T]he directors of the company ... are not liable personally ... for any debt or obligation created or incurred by the company[.]" Even if the Court assumes, as it must at this stage of the case, that the Board members negotiated the contracts and agreed to the contracts' terms on NMMCC's behalf, "it is well established that an agent acting within his authority for a disclosed principal is not personally liable unless he was expressly made a party to the contract or unless he conducts himself in such a manner as to indicate an intent to be bound." _Fryar v._

_Employers Ins. of Wausau_, 94 N.M. 77, 81, 607 P.2d 615, 619 (citing _Roller v. Smith_, 88 N.M. 572, 573, 544 P.2d 287, 288 (Ct.App.1975), _cert. denied_, 89 N.M. 6, 546 P .2d 71 (1975)). _See Romero v. Mervyn's_, 109 N.M. 249, 254, 784 P.2d 992, 997 (1989)("When an agent with the authority to do so negotiates a contract for a disclosed principal, the agent is not liable personally unless the agent expressly is made a party to the contract or the agent acts in a manner indicating an intent to be bound personally"). Hence, even if an enforceable contract exists, which is not the case, the Court would dismiss the Plaintiffs' breach of contract claims against the individual NMMCC board members.

III. _THE COURT WILL DENY THE MOTION TO DISMISS THE PLAINTIFFS' §
1983 CLAIMS._

**\*14** The Plaintiffs' Complaint alleges two claims under § 1983, one for Equal Protection violations (Count II) and another for Due Process violations (Count III). The Plaintiffs bring these claims against all of the Defendants. For purposes of this motion, however, the Court will consider only the claims against NMMCC and its individual Board members. The NMMCC Defendants argue that both claims fail because they are not state actors. With respect to the Due Process claim, the NMMCC Defendants argue that, even if they are state actors, the claims fails because the Plaintiffs did not have a protected property interest. Because the Court finds, however, that the NMMCC Defendants are state actors, and that the Plaintiffs may have had valid contracts creating a protected property interest, the Court will deny the motion to dismiss the § 1983 claims.

A. THE PLAINTIFFS' MUST DEMONSTRATE STATE ACTION TO PROCEED WITH THEIR § 1983 CLAIMS.

To state a claim for relief in an action brought under § 1983, the Plaintiffs must establish that: (i) they were deprived of a right secured by the Constitution or laws of the United States; and (ii) the alleged deprivation was committed under color of state law. _See American Mfrs. Mut. Ins. Co. v. Sullivan_, 526 U.S. 40, 49-50 (1999). " 'In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." ' *Rendell-Baker v. Kohn,* 457 U.S. 830, 838 (1982)(quoting *United States v. Price,* 383 U.S. 787, 794 n. 7 (1966)). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful[.]" *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. at 49-50 (citations and internal quotation marks omitted).

The ultimate question is whether the challenged conduct may be "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982). To answer this question, the Supreme Court of the United States has developed a two part test: (i) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible;" and (ii) "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* A party may fairly be said to be a state actor if "he is a state official, ... he has acted together with or has obtained significant aid from state officials, or ... his conduct is otherwise chargeable to the State." *Id.*

Although the two principles comprising this inquiry are related, they are not the same. "They collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* (citing *Monroe v. Pape,* 365 U.S. 167, 172 (1961)). "The two principles diverge when the constitutional claim is directed against a party without such apparent authority, i.e., against a private party." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 937.

**\*15** In this case, the parties agree that the Plaintiffs must demonstrate state action to proceed with their § 1983 claims. They do not agree, however, whether the NMMCC Defendants are state actors, private parties acting under state authority, or private parties acting entirely separate from the State. The Court will address this question separately

with respect to the individual Board members and NMMCC itself.

**B. THE INDIVIDUAL DIRECTORS ARE STATE ACTORS.**

Under *Lugar v. Edmondson Oil Co., Inc.,* the Plaintiffs must demonstrate that: (i) the Directors caused a constitutional deprivation by the exercise of some right or privilege created by the State, or that they did so as persons for whom the State is responsible; and (ii) that the Directors may fairly be said to be state actors. *See id.* at 937. These two inquiries will collapse into one another if the Directors' "official character is such as to lend the weight of the State to [their] decisions." *Id* . Based upon the explicit language of the Employers Mutual Company Act, the Court finds that the Plaintiffs have made the requisite showing that the individual Board members are state actors.

The Complaint states, and the Directors do not dispute, that, after the target examination, the Directors terminated the Plaintiffs' employment. *See* Complaint ¶ 56, at 9. The Directors contend that they took such action as private parties, and thus, are not subject to constitutional requirements. The Employers Mutual Company Act, however, does not support this assertion. The Act states: "Directors are appointed public officials of the state while carrying out their duties and activities under the [Act]." NMSA 52-9-6. This provision does not distinguish between the Directors whom the governor appoints and the Directors whom the shareholders elect.

Section 52-9-6 grants the Directors an "official character ... such as to lend the weight of the State to [their] decisions." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 937. In light of their status as "public officials," the Directors may fairly be called state actors. " '[S]tate employment is generally sufficient to render the defendant a state actor." ' *West v. Atkins,* 487 U.S. 42, 49 (1988)(quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 936 n. 18). [FN9] Accordingly, the Court believes that the Directors' challenged conduct in this case is "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 937.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9. There are, of course, circumstances under which state employment is insufficient to satisfy the state action requirement. *See Polk County v. Dodson,* 454 U.S. 312 (1981). In *Polk County,* the Supreme Court held that a public defender's actions, when performing a lawyer's traditional functions as counsel in a state criminal proceeding, would not support a § 1983 suit. In light of the public defender's adversarial role to the State, the Supreme Court found it "peculiarly difficult" to detect any action of the State in the circumstances of that case. *Id.* at 320. The Court does not find it "peculiarly difficult" to detect state action on the part of the individual Directors in this case. The statute explicitly states that they are "appointed public officials," they are not adversarial to the State, and, in fact, act as the governing body of a public corporation created to advance State goals.

C. NMMCC IS A STATE ACTOR.

The Court has concluded that the individual Directors are state actors for purposes of the Plaintiffs' § 1983 claims. Because NMMCC is also a defendant in this action, the Court must undertake the same analysis with respect to NMMCC. The Plaintiffs make two separate arguments concerning this defendant. First, the Plaintiffs allege that NMMCC is a governmental entity. Alternatively, the Plaintiffs contend that, even if NMMCC is a private corporation, it acted "jointly and in concert" with the State, that there is a close "nexus" between NMMCC and the State, and that there is "pervasive entwinement" between NMMCC and the State. Complaint ¶ ¶ 52-54, at 8-9. The Court will address each argument in turn.

**\*16** The Plaintiffs argue that, under Supreme Court case law, NMMCC is a governmental entity. *See Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374 (1995). In *Lebron,* the Supreme Court considered the question whether the National Railroad Passenger Corporation, commonly known as Amtrak, was an agency or instrumentality of the United States for the purpose of individual rights guaranteed by the Constitution. The Supreme Court found it significant that Congress created Amtrak by special statute, explicitly for the furtherance

of federal governmental goals, and that the President of the United States appoints six of the nine members on Amtrak's board of directors. *See id.* at 397 ("Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees."). Based upon these reasons, the Supreme Court held that Amtrak "is part of the Government for purposes of the First Amendment." *Id.* at 400.

A straightforward analysis of this case under the standards set forth in *Lebron* indicates that NMMCC is a governmental entity. Like Amtrak, NMMCC is a legislative creation. By enacting the Employers Mutual Company Act, the New Mexico Legislature "created [NMMCC] as a nonprofit, independent, public corporation for the purpose of insuring employers against the risk of liability for payment of benefits claims to workers." NMSA § 52-9-4. The New Mexico Legislature created NMMCC specifically to further State objectives:

The legislature finds that ... small and medium-sized employers ... face serious obstacles in securing insurance at reasonable rates in the private voluntary market. A primary purpose of the Employers Mutual Company Act is to create an insurance entity that will provide ... assistance and competitively priced workers' compensation and occupational disease disablement insurance to those small and medium-sized employers.

NMSA § 52-9-2B. Finally, the State government has retained permanent authority to appoint a majority of NMMCC's directors:

The governor shall appoint, with the consent of the senate, the initial eight directors of the board, and they shall then appoint the president, who shall be the ninth member of the board ..... Thereafter, as vacancies arise, directors shall be appointed or elected so that at all times five directors shall be appointed by the governor and three directors shall be elected by the company's policyholders[.]

NMSA § § 52-9-5C and 52-9-5D.

NMMCC argues that, despite that the *Lebron* standards point to the conclusion that it is a governmental entity, *Lebron* is distinguishable from this case. NMMCC points out that *Lebron* addressed the federal government, rather than a state

government, and that the holding states that "the corporation is part of the Government *for purposes of the First Amendment.*" *Lebron v. National Railroad Passenger Corporation,* 513 U.S. at 400 (emphasis added). NMMCC also argues that *Lebron* is distinguishable because the federal government exercised a greater amount of control over Amtrak than the New Mexico government exerts over NMMCC. The Court does not find any of these distinctions persuasive.

**\*17** NMMCC is correct that *Lebron* does not directly address state governments or individual rights other than those contained in the First Amendment. While the *Lebron* decision contains language upon which NMMCC may base an argument that the holding is limited, that language exists only because of the specific context of the case. When read as a whole, the opinion demonstrates that the Supreme Court's reasoning did not depend on those factors. Indeed, the Supreme Court stated: "It surely cannot be that government, *state or federal,* is able to evade *the most solemn obligations imposed in the Constitution* by simply resorting to the corporate form." *Id.* at 397 (emphasis added). "Facing the question of Amtrak's status for the first time, we conclude that it is an agency or instrumentality of the United States *for the purpose of individual rights guaranteed against the Government by the Constitution." Id.* at 349 (emphasis added). Thus, the Court does not believe that the Supreme Court intended the analysis in *Lebron* to apply only to claims against the federal government under the First Amendment. Indeed, although ultimately resting its decision on the concept of entwinement, the Supreme Court recently invoked *Lebron* in a case involving the Fourteenth Amendment. *See Brentwood Academy v. Tennessee Secondary School Athletic Association,* 531 U.S. 288, 295-96 (2001).

NMMCC also argues that the New Mexico Legislature did not intend for it to be considered a state agency. The Employers Mutual Company Act provides:

*The company shall not be considered a state agency for any purpose.* This includes exempting the company from all state personnel, salary and procurement statutes, rules and regulations. The insurance operations of the company are subject to all of the applicable provisions of the Insurance Code in the same manner as those provisions apply to a private insurance company. The company is subject to the same tax liabilities and assessments as a private insurance company.

NMSA § 52-9-21 (emphasis added). The Court does not see any indication that the Legislature enacted this provision in an attempt to preclude a judicial finding

of state action. [FN10] The majority of the provision addresses the company's legal responsibilities under particular state laws, not liability for alleged constitutional violations.

FN10. The title of the provision is "Exemption from and applicability of certain laws."

Even if the Court assumes that the Legislature intended § 52-9-21 to preclude a finding of state action in a law suit such as the present one, the inquiry does not end. The Supreme Court has stated that "our cases are unequivocal in showing that the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 531 U.S. at 296. In *Lebron,* the Supreme Court disregarded a similar statute and found that a legislative body does not possess the authority to make a final determination of a corporation's status for purposes of citizens' constitutional rights. *See Lebron v. National Railroad Passenger Corporation,* 513 U.S. at 392 ("If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment."). In that case, Amtrak's authorizing statute declared that Amtrak "will not be an agency or establishment of the United States Government." *Id.* at 391 (quoting 45 U.S.C. § 541). The statutory language that NMMCC relies upon is similarly ineffective to prevent a finding of state action.

**\*18** Accordingly, the Court finds that *Lebron* applies to this case. Application of the factors described in *Lebron'* s holding requires a finding that NMMCC is a governmental entity. The Court finds that NMMCC is a governmental entity for purposes of the Plaintiffs' constitutional claims.

Under *Lebron,* the Court believes that NMMCC is a governmental entity for purposes of the Plaintiffs' § 1983 claims. Even if the Court assumes, however, that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NMMCC is a private insurer as the Defendants assert, the entwinement between the corporation and the State is sufficient to justify a finding of state action. Thus, the Court would still find that NMMCC is subject to constitutional constraints.

The Supreme Court has developed several tests to assist courts in determining whether private conduct is fairly attributable to the State. The United States Court of Appeals for the Tenth Circuit recently reviewed these tests, acknowledging that determining whether a private party should be treated as a state actor is an "inherently murky calculation." *Tool Box v. Ogden City Corp., 316 F.3d 1167, 1175-76 (10th Cir.2003), opinion vacated on rehearing* en banc *by Tool Box v. Ogden City Corp., 355 F.3d 1236 (10th Cir.2004). [FN11]* These tests include: (i) the public function test; (ii) the nexus test; (iii) the joint action test; and (iv) the symbiotic relationship test. *See id.* at 1176.

FN11. The Tenth Circuit's substituted opinion in *Tool Box* did not affect its prior state action analysis. The substituted opinion appears to have assumed state action, as found in the first opinion, and focused exclusively on whether the defendant had violated the First Amendment.

In a 5-4 decision, the Supreme Court recently discussed the concept of "entwinement." *Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. at 295-96.* But *see id.* at 305 (Thomas, J., dissenting) (opening sentence in the dissenting opinion: "We have never found state action based upon mere 'entwinement.' "). The Tenth Circuit has interpreted *Brentwood* as "both supplement[ing] and clarif[ying] the[ ] variously competing tests." [T]he notion of entwinement recognizes that the four foregoing tests are, for all intents and purposes, tools for factual analysis that bear on the fairness of ... an attribution of state action. Accordingly, *Brentwood* implores courts to apply the tests only so far as they force courts to zero in on the fact-intensive character of a state action determination. *Tool Box v. Ogden City Corp., 316 F.3d at 1176* (citations and internal quotation marks omitted).

In their Complaint, the Plaintiffs invoke the concept of entwinement, as well as two of the traditional state action tests, joint action and nexus. *See* Complaint ¶ ¶ 52-54, at 8-9. In *Brentwood,* the Supreme Court emphasized that "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient [.]" *Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. at 295.* Because the Plaintiffs raise these issues, the Court will address each of them in turn.

1. Entwinement

**\*19** With respect to entwinement, the Court believes that many of the factors it has previously discussed compel a finding of state action. It is relevant to the Court's analysis that the Legislature created NMMCC for the purpose of meeting State objectives. The State took the initiative to create NMMCC and remains intricately involved in its management. Accordingly, the Court finds that the level of entwinement between NMMCC and the State requires a finding that NMMCC is a state actor.

This pervasive entwinement will continue because the Legislature has given the governor the permanent authority to appoint a majority of the directors. *See NMSA § 52-9-5.* The governor also has the power to remove his appointees if two-thirds of the members of the senate approve the removal. *See id.* The requirement of senate approval suggests State entwinement; it "do[es] not ... establish an absence of control by the Government as a whole, but rather constitute[s] a restriction imposed by one of the political branches upon the other." *Lebron v. National Railroad Passenger Corp., 513 U.S. at 398.*

A comparison between the Plaintiffs' allegations, and the Supreme Court's and Tenth Circuit's seminal entwinement cases, supports the Court's finding. In *Brentwood,* the Supreme Court found that a secondary school athletic association, whose membership included both private and public schools, was "entwined" with the state and therefore engaged in state action. The make-up of the association's governing body was important to the Supreme Court's decision. Principals, assistant principals, and superintendents from the member schools comprised the association's legislative council and board of control. The Supreme Court noted that 84% of those schools were public. The Court noted that, in addition to school representatives, a state board of education member simultaneously served as an ex officio member of the board, thereby giving the state an element of control over the proceedings. In addition to the Board, the Court found it important that the association staff were eligible to receive state retirement benefits. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court thus determined that the association was "intertwined" with the state and that the association's decisions could fairly be attributed to the state.

The allegations here show that NMMCC is similar to the association in *Brentwood* in all material respects. All of NMMCC's directors are appointed public officials. Although it does not appear that the directors receive state retirement benefits, this fact does not lessen the impact of the State's control over NMMCC's decisions through its Board, which is comprised of appointed public officials.

In *Tool Box v. Ogden City Corp.,* the Tenth Circuit applied *Brentwood'* s entwinement test, and the result counsels that the Court deny the motion to dismiss the § 1983 claims in this case. *See Tool Box v. Ogden City Corp., 316 F.3d at 1177.* There, the City of Ogden, Utah, passed a "Sexually-Oriented Business zoning ordinance" to prevent the concentration of adult night clubs "in areas deleterious to the community of Ogden." In 1995, the city established protective covenants restricting land use within those areas previously designated as acceptable locations for such clubs. In doing so, the city created a three-member "special approval committee" (the "committee") to enforce the covenants. The mayor appointed all of the committee's members, and the ordinance required that two of the members be city employees. The mayor had final authority over all committee appeals.

**\*20** The plaintiff, who sought to build an adult night club, filed the appropriate applications, which were denied, and then filed a § 1983 claim on First Amendment grounds. In reviewing the claim, the threshold question for the Tenth Circuit was whether the committee's decision to deny the plaintiff's application constituted state action for § 1983 purposes. The Tenth Circuit determined that it was.

As in *Brentwood,* the existence of a single non-municipal member does not transform the Review Board into a private actor. Such an argument would necessarily have to contend with the Mayor's installation of two Ogden City employees on the three-member approval panel. Most damning is that the Mayor himself hears and has final authority over all appeals from Review Board decisions. The lone way to categorize the Review Board's decision as that of a private actor would be to turn a blind eye to structural realities--all of which point to the inescapable conclusion that the review board engaged in "conduct ... fairly attributable to the State." *Lugar [v. Edmondson Oil Co.], 457 U.S. at 937.*

*Tool Box v. Ogden City Corp., 316 F.3d at 1177.*

The committee in *Tool Box* is indistinguishable from NMMCC for reasons similar to those that prevent distinction from the association in *Brentwood.* The governor's appointments in this case, while different in number, are no different in consequence than the Ogden Mayor's appointments in *Tool Box.* Because of the language in § 52-9-6, the entire NMMCC Board is comprised of public officials. This is a greater percentage than existed on the committee in *Tool Box.*

For all of these reasons, the Court determines that the Plaintiffs have sufficiently alleged that NMMCC acted under color of state law when it terminated the Plaintiffs. NMMCC is pervasively entwined with the State. The Court will, as a result, deny the motion to dismiss the Plaintiffs' § 1983 claims.

2. Joint Action

Although the Court's finding of pervasive entwinement between NMMCC and the State is a sufficient basis upon which to deny the motion to dismiss, the Court will also address the joint action test. In describing the joint action test, the Tenth Circuit has stated the following:

Under the joint action test, state action exists if a private party is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. 24, 27 (1980). Courts have typically looked to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher [v. Neil Young Freedom Concert], 49 F.3d [1442,] 1453.* If state and private officials have engaged in a substantial degree of cooperative action, or if state participation is "overt and significant" in facilitating the deprivation of constitutional rights, a court will find state action. *Id. at 1454* (citation omitted).

*Tool Box v. Ogden City Corp., 316 F.3d at 1176.* To support their allegation of joint action, the Plaintiffs state that "New Mexico Mutual acted jointly and in concert with the Insurance Division and Defendants Romero and Serna, and jointly in concert with the Director Defendants, a majority of whom are appointed to by the Governor of New Mexico." Complaint ¶ 52, at 8.

**\*21** As the Court discussed above, the directors' status as public officials is a central element of this case. That status supports a finding that NMMCC was a "willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. at 27. It was these State agents that allegedly made the final decision to terminate the Plaintiffs. *See* Complaint ¶ 56, at 9. Thus, even if NMMCC itself is a private entity, it allegedly "acted in concert [with State officials] in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

effecting [the] particular deprivation of constitutional rights [at issue]." *Gallagher v. Neil Young Freedom Concert,* 49 F.3d at 1453.

3. Nexus

The nexus test provides yet another basis for the Court's decision to deny the motion to dismiss the Plaintiffs' § 1983 claims.

Under the nexus test, a court considers whether " 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.' " *Gallagher [v. Neil Young Freedom Concert],* 49 F .3d [at] 1448 (quoting Jackson [v. Metro. Edison Co.], 419 U.S. [345,] 351 [ (1974) ] ). That is, "a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." ' [*Johnson v.] Rodriguez (Orozco),* 293 F.3d [1196,] 1203 [ (10th Cir.2002) ](citing *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982)). *Tool Box v. Ogden City Corp.,* 316 F.3d at 1176. Based on the fact that state officials allegedly made the ultimate decision to terminate the Plaintiffs' employment, the Court believes that it can fairly be said that the State "exercised coercive power or ... provided such significant encouragement ... that the choice must in law be deemed to be that of the State." *Johnson v. Rodriguez,* 293 F.3d at 1203.

D. BECAUSE THE PLAINTIFFS MAY HAVE PROTECTED PROPERTY INTERESTS, THEY HAVE SUCCESSFULLY ALLEGED DUE PROCESS CLAIMS.

The NMMCC Defendants argue that, even if they are state actors, the Plaintiffs' Due Process claims (Count III) fail for two reasons. First, because their Contracts were not valid, the Plaintiffs did not have protected property interests in continued employment with NMMCC. Second, NMMCC contends that, as a private insurer, it did not have a duty to provide the Plaintiffs with a hearing before the termination of their employment. *See* Complaint ¶ 79, at 12 ("New Mexico Mutual and the Director Defendants failed to afford Plaintiffs a hearing on the subject of their continued employment at New Mexico Mutual."). Because the Court has found that NMMCC is not a private insurer, the Court believes that the second argument does not provide a basis to dismiss the Plaintiffs' Due Process claims.

With respect to the first argument, the Court agrees

with the Defendants' analysis as it applies to the 1997 and 2000 written Contracts, as well as any implied contracts containing volume-based compensation provisions. The Court has found that these claims fail to state a claim upon which relief can be granted.

**\*22** A property interest in continued public employment is not created by the Constitution. *See Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564 (1972). Rather, a property interest in continued public employment must "stem from an independent source such as state law." *Id.; see also Lancaster v. Indep. Sch. Dist. No. 5,* 149 F.3d 1228, 1234 (10th Cir.1998). State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts. *See Carnes v. Parker,* 922 F.2d 1506, 1509 (10th Cir.1991). *Kingsford v. Salt Lake City Sch. Dist.,* 247 F.3d 1123, 1128 (10th Cir.2001).

The Court has also found, however, that any written or implied contracts that do not contain provisions for volume-based compensation are unaffected by the Court's ruling. There are allegations in the Complaint that, if supported by competent evidence, could support a finding that the Plaintiffs entered into a valid implied contract with NMMCC that did not contain provisions that would subject it to superintendent review under § 59A-34-17. Accordingly, the Court cannot say that there is no set of facts that would entitle the Plaintiffs to relief under their Due Process claims. They may indeed have a protected property interest.

In addition, NMMCC's contention that it had no obligation to afford the Plaintiffs a hearing before terminating their employment does not provide a basis for dismissal of the Due Process claims. That contention was based upon the assertion that NMMCC is a private insurer. Because the Court has found that NMMCC is a governmental entity, it is subject to all of the requirements of the Constitution. "The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar,* 520 U.S. 924, 928 (1997). Accordingly, because the NMMCC Defendants are state actors, and the Plaintiffs may have protected property interest in continued employment, the Court will deny the motion to dismiss the Plaintiffs' § 1983 claims.

IV. *THE COURT WILL DENY THE MOTION TO DISMISS JORNIGAN'S NEGLIGENCE CLAIM AGAINST NMMCC.*

In Count VIII of the Complaint, Jornigan states a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim for negligence against NMMCC, alleging that NMMCC breached a duty to her "when it failed to prevent Smalley from continuing to harass [her]." Complaint ¶ 106, at 16. Although Jornigan does not use the phrase "negligent supervision," the Court reads Count VIII as a claim for negligent supervision. The claim is against the employer, is based on another employee's conduct, and alleges that the employer failed to prevent harassment.

The NMMCC Defendants contend that Jornigan is attempting to recast her Title VII and New Mexico Human Rights Act claims into a claim for negligence. The Defendants also assert that New Mexico has not recognized a simple negligence cause of action against an employer in this context. To the extent Jornigan's claim is for negligent supervision, the Defendants argue that she has not properly pled conduct rising to the level of an intentional tort as required under New Mexico law.

**\*23** Because the Court interprets Jornigan's claim as one for negligent supervision, it need not address the NMMCC's Defendants contention that New Mexico has not recognized a cause of action for simple negligence against an employer in this context. With respect to negligent supervision, the Court finds that New Mexico has recognized such a cause of action. *See Coates v. Wal-Mart Stores, Inc.,* 1999-NMSC-013, ¶ 35, 976 P.2d 999, 1006. The question then becomes whether Jornigan has alleged the necessary elements to proceed under that theory.

In *Coates v. Wal-Mart,* the Supreme Court of New Mexico acknowledged that a plaintiff/employee can recover against an employer under a negligent supervision theory for psychological injuries occurring as a result of physical and verbal sexual harassment by a supervisor where the employer knew of the harassment and failed to act. The court found that the New Mexico Workers' Compensation Act ("WCA") did not preclude such a claim because: (i) the injuries related to sexual harassment do not arise out of employment; (ii) substantial evidence existed that the employer intended to injure the employee; and (iii) the injuries are not compensable under the WCA. *See id. at ¶ 24, 976 P.2d at 1004.* The court noted that any one of those three exceptions was sufficient to remove the claim from the coverage of the WCA. *See id.*

Thus, the court did not require that the plaintiffs plead conduct rising to the level of an intentional tort to state a claim for negligent supervision. Conduct rising to that level happened to exist in *Coates* and the court noted that such conduct would be sufficient to remove it from the scope of the WCA. The court was clear,

however, that either of the other two rationales was also independently sufficient. *See id.*

The Court does not see any meaningful distinction between this case and *Coates.* Jornigan has alleged that Smalley subjected her to repeated acts of sexual harassment, that NMMCC Defendants were aware of such conduct, and that they failed to take any action to prevent continued harassment. *See* Complaint ¶¶ 25-27, 29-31, 106, at 4-5, 16. Like in *Coates,* there are allegations to support a finding that NMMCC intended to injure Jornigan. Even if there are not, however, the other bases for the *Coates* decision would allow Jornigan's claim to proceed. Accordingly, the Court will deny the motion to dismiss Jornigan's negligence claim against NMMCC.

IT IS ORDERED that the NMMCC Defendants' Motion to Dismiss is granted in part and denied in part. The Court will grant the motion with respect to Counts VI (Breach of Contract) and VII (Breach of Implied Contract) to the extent that they seek relief under the 1997 and 2000 written employment contracts or under any contract that contains a volume-based compensation provision. The Court will dismiss those two counts against the NMMCC Defendants to the extent that they seek relief under the 1997 and 2000 written employment contracts or under any contract that contains a volume-based compensation provision with prejudice. The Court otherwise denies the motion to dismiss Counts VI and VII. The Court will deny the motion with respect to Counts II (Equal Protection), III (Due Process), and VIII (Negligence).

Not Reported in F.Supp.2d, 2004 WL 3426437 (D.N.M.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv00813 (Docket) (Jul. 10, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.